914 P.2d 1291

**STATE of Arizona, Appellee,**

v.

**Richard Dean HURLES, Appellant.**

**No. CR–94–0366–AP.**

Supreme Court of Arizona,
En Banc.

April 16, 1996.

Grant Woods, Arizona Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Colleen L. French, Assistant Attorney General, Phoenix, for State of Arizona.

Dean W. Trebesch, Maricopa County Public Defender, by James H. Kemper, Phoenix, for Richard Dean Hurles.

## OPINION

FELDMAN, Chief Justice.

On April 15, 1994, a jury found Richard Dean Hurles guilty of first-degree burglary of the Buckeye Public Library, as well as attempted sexual assault and first-degree murder of Kay Blanton. The trial court sentenced Hurles to death on his murder conviction. This is Hurles' direct, automatic appeal of his murder conviction and death sentence. Ariz.R.Crim.P. 26.15 and 31.2(b). This court has jurisdiction under Ariz.Const. art. VI, § 5(3) and A.R.S. §§ 13–4031 and 13–4033(A).

## BACKGROUND

After serving nearly fifteen years in prison for sexually assaulting two young boys, Richard Dean Hurles was released on parole in June 1992. Following his release, Hurles moved to Buckeye, where some of his family lived.

On the afternoon of November 12, 1992, Hurles went to the Buckeye public library, a small, house-type building in a residential neighborhood. The only employee in the library at the time was Kay Blanton. The last patron, other than Hurles, left the library just before 2:40 p.m. Hurles then locked the front doors to the library and attacked Blanton in the back room. He stripped off her underwear and pulled her skirt above her waist in an unsuccessful attempt to rape her. Using a paring knife found in the back room of the library, Hurles mortally wounded Blanton, stabbing her thirty-seven times and inflicting blunt force trauma by kicking her to such an extent he tore her liver.

At approximately 2:45 p.m., Mark Porter and his friend, John Kale, went to the library and discovered the front doors were locked. Porter looked through the window and saw Blanton lying in a pool of blood. While Porter went around to the back door of the library, Kale ran across the street to a house where Dale Capper was working on his truck. Capper had noticed Porter and Kale try to open the library door and had, at the same time, seen Hurles "crash" through the back door of the library, run toward him, and

then head down the street. After Kale explained what he and Porter had seen, Capper got into his truck and followed Hurles. Meanwhile, Porter entered the library through the open back door and called 911. The call to 911 was received at 2:50 p.m.

Capper followed Hurles down the street and caught up to him at a four-way stop. While he was stopped, Capper had an excellent opportunity to identify Hurles when the latter approached the truck and asked Capper "How are you doing?," to which Capper responded "I'm doing okay." Capper then observed Hurles enter an apartment complex, at which point Capper left his truck and continued following Hurles.

At the apartment complex, Capper saw Hurles talking to Robert Phillips, who knew Hurles. Phillips was outside fixing a lawnmower when Hurles approached and asked to borrow the bicycle laying next to him. Phillips initially refused to let Hurles take the bike but relented after Hurles asked him ten to twenty times. At approximately 3:00 p.m., Capper watched Hurles ride away on the bicycle; he then returned to the library to tell police what he had seen.

Between 3:00 and 4:00 p.m., Hurles rode the bicycle to the home of his nephew, Thomas, in Buckeye and asked Thomas for a ride to Phoenix. Hurles had changed his clothes and cleaned himself up somewhat, and Thomas, who had been asleep and was unaware of Blanton's murder, agreed to drive Hurles to Phoenix. As the two left the house, Hurles was carrying a bundle of clothes. During the drive to Phoenix, Thomas noticed that Hurles had bite marks on his wrist. When asked about them, Hurles told Thomas he had been in a fight with a Spanish man at the library, that he had stabbed the man with the man's knife, and that he had received the bite marks in the fight. As part of his insanity defense, however, Hurles later claimed he had no recollection of anything that occurred between sitting in the library and going out the back door.

As they continued toward Phoenix, Hurles had Thomas pull over so he could toss the bundle of clothes out the car window. Thomas left Hurles at a Phoenix bus station, where he purchased a bus ticket to Las Vegas. Thomas returned to Buckeye, where he ultimately made contact with the police and told them of Hurles' destination. Later that evening, the police intercepted Hurles' bus on the way to Las Vegas; Hurles was removed from the bus, arrested, and returned to Phoenix.

With Thomas' help, the police recovered Hurles' discarded clothes. Police found blood on the clothing that matched Blanton's blood type, which occurs in one percent of the population. Police also found blood matching Blanton's type on Hurles' shoes, which he was still wearing when taken from the bus. Four bloody shoeprints at the murder scene matched the soles of Hurles' shoes, and Hurles' palm print was found on the paring knife left at the scene.

On April 15, 1994, all twelve jurors found Hurles guilty of both premeditated and felony murder. The trial court sentenced Hurles to death and this appeal followed.

## TRIAL ISSUES

### A. The insanity defense

#### 1. Hurles' consent

■ After Hurles entered a not guilty plea, his lawyer filed notice of an insanity defense. *See* Ariz.R.Crim.P. 15.2(b). On appeal, Hurles claims the insanity defense is, in essence, a distinct "plea" of not-guilty-by-reason-of-insanity, which he equates to a guilty plea. Hurles contends that he never agreed to enter such a plea and therefore that his fundamental right to due process under the 14th Amendment was violated. Hurles argues that an insanity defense eliminates the presumption of innocence and removes the state's burden of proving the crime beyond a reasonable doubt. Hurles submits, therefore, that a defendant's express consent to the insanity plea must be demonstrated in the same manner as a defendant's consent to such things as pleading guilty and waiving a jury trial.

We find no support for Hurles' proposition that Arizona recognizes a distinct plea of "not guilty-by-reason-of-insanity." *See State v. Alford,* 98 Ariz. 249, 250, 403 P.2d 806, 807 (1965) ("The rule ... that in a prosecution

for homicide, defendant, under the general *plea* of not guilty, may set up the *defense* of insanity ... has not been changed by adoption of the Rules of Criminal Procedure.") (emphasis added). Thus, Arizona maintains a distinction between recognized pleas and affirmative defenses, such as insanity. *See* A.R.S. § 13–502 (setting forth the standard for insanity and defendant's burden of proof in asserting that defense); Rule 14.3(a) (delineating those pleas the court must ascertain the defendant is entering as including guilty, not guilty, and no contest).

■ Hurles participated in a Rule 11 competency hearing and was found competent to stand trial. *See State v. Gretzler,* 126 Ariz. 60, 73–74, 612 P.2d 1023, 1036–37 (1980). Therefore, on this record, we must presume that because Hurles was competent to stand trial he understood the nature of the proceedings and was able to participate in his defense. Hurles also had psychiatric evaluations by both his expert and the state's, was present in court for the trial, and heard the lawyers and witnesses. Yet, Hurles never objected or expressed concern to the judge when his lawyer conceded certain facts, explained what "insanity can mean," and told the jury in her opening statement to think of Hurles as Frankenstein: "He can't help it, he's just a monster."

■ We refuse to speculate that Hurles either sat through the entire proceeding unaware that his lawyer was presenting an insanity defense, or that Hurles was aware of but sat in silent opposition to such a defense. On this record, therefore, we assume that Hurles was aware of the proceedings and consented to the strategy pursued by his lawyer. Assuming, *arguendo,* that the defendant may control the decision, the failure of counsel to show on the record express permission from the defendant to advance an insanity defense is not fundamental error. Absent an objection on the record or proof that the defendant was unaware that the defense was advanced, the claim is waived. *See State v. Gendron,* 168 Ariz. 153, 154, 812 P.2d 626, 627 (1991). *Cf. Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) (reversible error where record did not disclose defendant vol-

untarily and understandingly entered guilty pleas). Accordingly, Hurles' claim on this issue is waived. *See State v. Ryan,* 248 Neb. 405, 534 N.W.2d 766 (1995) (holding that defendant acquiesced in insanity defense by cooperating with the psychiatrists and that attorneys made reasonable strategic choice in asserting insanity defense).

### 2. Burden of proof

■ We also disagree with Hurles' assertions that the insanity defense vitiates the presumption of innocence or negates the state's burden of proof. Even though criminal defendants have the burden of proving insanity under A.R.S. § 13–502(B), which may but need not result in a strategy of admitting certain facts of the crime charged, the presumption of innocence and the state's burden remain unchanged.

Recognizing insanity as an affirmative defense does not negate the state's burden of proof. *State v. Fletcher,* 149 Ariz. 187, 192, 717 P.2d 866, 871 (1986). The state is still required, as it did in this case, to prove every element beyond a reasonable doubt. *See id.* Because the insanity defense does not require the defendant to prove or to disprove any element of the offense charged, there is no change in the presumption of innocence. On the contrary, regardless of whether the defendant is able to prove insanity, an acquittal will result if the state fails to meet its burden.

### B. Prior bad acts

This issue involves two separate matters: 1) Rolla Williams' testimony that he told Hurles not to come to Williams' house anymore, and 2) the testimony of psychiatric experts regarding Hurles' prior molestation convictions and the details of those prior crimes.

### 1. Testimony of Rolla Williams

■ Hurles claims that the trial judge erred in agreeing to let Williams testify about the details of Hurles' prior convictions. The state wanted to use those convictions as an explanation for Williams' testimony that

he told Hurles not to come to the house anymore.

We need not determine whether the trial judge's ruling on this matter was correct because the state did not ask, and Williams did not testify, about the prior convictions or their underlying details. Instead, the state asked Williams to explain "the circumstances surrounding your asking [Hurles] not to come to the house." In his response, Williams testified only that Hurles' brother asked him to tell Hurles not to come around anymore because the brother feared Hurles would rape the two young children living with Williams. These children happened to be Hurles' niece and nephew. Because the testimony about which Hurles complains was never adduced, his argument is without merit.

### 2. Testimony of psychiatric experts

■ Hurles' psychiatric expert, Dr. Walters, testified that insanity was a likely diagnosis because the circumstances surrounding Blanton's murder made it highly probable Hurles would be caught. The state refuted that opinion by pointing out that Hurles' prior convictions involved violent sexual attacks on two boys he was acquainted with, making it likely Hurles would be caught. At the beginning of his case-in-chief, Hurles argued that the state should not be allowed to go into the details of the conduct underlying his earlier convictions. Hurles asserted that whatever relevance those prior acts had to rebut the insanity defense, their probative value was outweighed by their prejudicial effect. The trial judge disagreed and ruled that evidence about the facts underlying the prior convictions were relevant and more probative than prejudicial.

Details related to the convictions were then introduced, *by Hurles,* on direct examination. Hurles' lawyer engaged in the following exchange with their insanity expert, Dr. Walter:

> Q. [by defense counsel] Somewhere in those reports ..., Dr. Walter, the circumstances of the offenses, were they described?
>
> A. Yes, they are.

> Q. What is your understanding based on reviewing that report, what the circumstances underlying Mr. Hurles' [earlier] convictions?
>
> A. These were sex offenses ... he attacked and sodomized two boys over a period of a year. And apparently both occasions there was alcohol involved.

This testimony did nothing more than provide a foundation for Dr. Walter's ultimate conclusion, elicited after further testimony, that Hurles was psychotic and legally insane at the time he murdered Blanton.

■ On cross-examination, the following exchange took place between the prosecutor and Dr. Walter:

> Q. [by prosecutor] Doctor, isn't it in fact true that a large basis for your opinion is the fact that this crime occurred in the middle of the afternoon, in the public library?
>
> A. That is one of the significant points of the bizarreness of this crime. There are certainly other points.
>
> Q. Doctor, lots of people commit crimes that don't seem to make any sense, but they are not insane. Isn't that true?
>
> A. I think that you need to examine each case on its own merits. So you would have to give me some examples or specific cases or be more specific in your question.
>
> Q. Doctor, let me ask you this. Back in 1978 Mr. Hurles committed a crime with a young boy that he knew. Is that right?
>
> A. Yes.
>
> Q. Took him out to a cotton field?
>
> A. Right.
>
> Q. Had anal intercourse with him?
>
> A. Correct.
>
> Q. Isn't that bizarre?
>
> A. At the time he was felt by the psychiatrist to be mentally retarded. And mentally retarded people do those kind of things, without really understanding the criminality of their conduct.
>
> Q. Doctor, Mr. Hurles isn't mentally retarded now?
>
> A. No, he is not, right.

. . .

**Q.** Doctor, the incident in March of 1979 where he brought a boy out to a cotton field with a knife, a boy he knew, isn't that bizarre?

**A.** That is. I don't know how bizarre that is. That sounds like it was certainly abnormal. Again, I am not sure because of the time and because of the records that I looked at. . . .

**Q.** Doctor, isn't part of the reason why you say that Mr. Hurles was psychotic at the time [of this crime] was because of the place where this happened, and the probability that he would get caught?

**A.** That was certainly part of it. . . .

Thus, it was defense counsel, not the prosecutor, who first elicited details about the prior acts for which Hurles was convicted. Even if we assume defense counsel was merely "drawing the sting," given the nature of the charges related to those prior acts the evidence elicited on cross-examination was relevant to the question of Hurles' insanity. *See* 2 WIGMORE ON EVIDENCE § 228 (1979):

Sanity and insanity are terms applicable to the mode of operation of the mind as judged by some accepted standard of normality. The mode of operation of the mind is ascertainable from the conduct of the person in question, i.e., *from the effect produced by his surroundings on his mind when responding by action to those surroundings*. . . . On the one hand, no single act can be of itself decisive; while, on the other hand, any act whatever may be significant to some extent.

The first and fundamental rule, then, will be that any and all conduct of the person is admissible in evidence. There can be [no restriction]; *for if a specific act does not indicate insanity it may indicate sanity. It will certainly throw light one way or the other upon the issue*.

*Id.* (emphasis added).

We believe that the facts and circumstances surrounding those prior acts tended to "throw light one way or the other" upon the issue of his sanity and thus were relevant. *See State v. Vickers*, 159 Ariz. 532, 540, 768 P.2d 1177, 1185 (1989) ("When insanity is at issue, evidence of prior bad acts is admissible if relevant, Ariz.R.Evid. 402, and if the probative value of the evidence is not substantially outweighed by unfair prejudice, Ariz.R.Evid. 403"); *see also State v. Hinchey*, 165 Ariz. 432, 436, 799 P.2d 352, 356 (1990) ("Once a defendant raises insanity as a defense, evidence of prior bad acts falls out of the limitations of Rule 404. All prior relevant conduct in the defendant's life is admissible [subject to Rule 402] because such evidence may assist the trier of fact in determining criminal responsibility."); *Ex parte Anthony*, 565 So.2d 565 (Ala.1990) ("where insanity is relied upon as a defense, every act of the accused's life that throws some light on the issue is relevant").

Hurles committed the murder within months of his release from prison for those prior offenses. *See State v. Roscoe*, 145 Ariz. 212, 217, 700 P.2d 1312, 1317 (1985) (under Rule 404, offense not too remote when committed within six months after defendant's release from prison for the prior offense). The only other time the prior convictions or their details were mentioned was first by defense counsel, who brought it up in closing arguments, and then by the prosecution, in rebuttal. However, mention of this matter during closing was little more than a passing reference by either side.

■ Hurles also complains that the prosecution's insanity expert erroneously was allowed to testify about the earlier molestations. This claim is baseless. The prosecution's expert, Dr. Don, did not testify about the earlier convictions. Rather, Dr. Don testified about his interview of Hurles in which he asked questions regarding Hurles' sexual interests. Assuming this is Hurles' real complaint, we still find no error. Hurles told Dr. Don that he had an interest in sexual activity with young males, and Hurles specifically referred to it as sodomy. Hurles also told Dr. Don that he was interested in forceful, violent sexual activity, and that his behavior of choice was bondage, where he would bind the female and then whip her until she began to bleed. Hurles told Dr. Don that this had occurred with prostitutes and also that he had forced it on other females. Dr. Don never mentioned

the 1978 or 1979 molestations. Obviously, the questions put by Dr. Don were relevant to the issue of insanity.

In part, Dr. Walter grounded his opinion that Hurles was psychotic at the library on what he considered to be the "bizarreness" of the circumstances, *i.e.,* that it occurred in a public place in the middle of the day, making it likely he would get caught. The prosecution used the facts of the earlier molestations to show that when Hurles wanted sexual gratification he forced it on others, even when the circumstances made it highly likely he would get caught. These facts arguably showed that Hurles had no regard for the consequences of such actions. This, along with a statement Hurles made earlier to Williams that he would find a woman to have sex with, his statement to Dr. Don regarding his sadistic sexual predilections, as well as the fact that Hurles was not considered insane at the time of his molestation convictions in 1978 or 1979, refuted the insanity defense. Accordingly, we find no error in the admission of any of the testimony relating details of Hurles' prior convictions.

## C. Admission of the fingerprint cards

█ The night Hurles was arrested and taken to the police station, he was fingerprinted by Officer Holmes. At trial, Officer Owens testified that Holmes did the fingerprinting and then gave Owens the cards. All the fingerprint cards bear the name of Mark Holmes as the person who took the prints and the name of Richard Dean Hurles as the person whose prints are on the cards. Owens in turn gave the cards to James Serpa, the evidence technician. Serpa testified that the prints on the card matched the prints on the bloody paring knife found at the murder scene.

Hurles argues that there was insufficient evidence to establish chain of custody from Holmes to Owens and therefore insufficient foundation to admit the fingerprint cards. The state argues that "Detective Owens' hearsay testimony to the effect that Officer Holmes had fingerprinted Appellant and that those prints appeared on Exhibit 62" was sufficient to establish foundation through chain of custody.[1]

From the context of the testimony, it appears that Owens saw Holmes preparing Hurles for fingerprinting, left the room while the actual fingerprinting was done, then was handed the completed cards by Holmes. Hurles contends that Holmes' failure to testify that he took the prints and gave them to Owens makes the chain of custody insufficient. We disagree.

█ In setting up a chain of custody, the prosecution need not call every person who had an opportunity to come in contact with the evidence sought to be admitted. *State v. Davis,* 110 Ariz. 51, 54, 514 P.2d 1239, 1242 (1973). This court previously has held that an exhibit may be admitted "when there is evidence which strongly suggests the exact whereabouts of the exhibit at all times, and which suggests no possibility of substitution or tampering." *State v. Hardy,* 112 Ariz. 205, 207, 540 P.2d 677, 679 (1975).

Here, Owens testified that he saw Holmes preparing to fingerprint Hurles and that he received from Holmes the fingerprint cards purporting to be those of Hurles and bearing Holmes' name as the person who did the fingerprinting. Thus, although there is no testimony from Holmes that he gave Hurles' fingerprints to Owens, Owens' testimony strongly suggests that the prints went from Holmes to Owens and that the whereabouts of the fingerprint card was known at all

---

1. The following is Owens' testimony:

> **Q.** Detective [Owens], ... what happened to the fingerprints?
> **A.** The fingerprints were done by Officer Holmes and they were turned over to myself where I placed them into evidence, and they were sent to the Maricopa County Sheriff's Office ID techs and turned over to Mr. Jim Serpa.

> **Q.** I am going to show you what is marked Exhibit No. 62 for identification and ask you to look at that.
> **A.** These are the latent cards made up by officer Holmes on Mr. Hurles.
> DEFENSE COUNSEL: Your Honor, may I voir dire the witness?
> THE COURT: Yes.
> **Q.** So you were not there to see the prints actually being produced on these cards?
> **A.** No, I did not.

times. Furthermore, there is no suggestion by Hurles or from the record that there was a real possibility of substitution or tampering. The trial judge did not err in admitting the fingerprint cards.

## SENTENCING ISSUES

### A. Independent review

Hurles has raised no issues relating to his sentence. Nevertheless, when the trial judge imposes the death sentence, this court conducts a thorough and independent review of the record and of the aggravating and mitigating evidence to determine whether the sentence is justified. *State v. Brewer,* 170 Ariz. 486, 500, 826 P.2d 783, 797, *cert. denied,* 506 U.S. 872, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992).

The trial judge weighs aggravating and mitigating circumstances to determine whether the death sentence is warranted. A.R.S. § 13–703. The state must prove aggravating circumstances beyond a reasonable doubt. *See* A.R.S. § 13–703(C); *Brewer,* 170 Ariz. at 500, 826 P.2d at 797. The defendant must prove mitigating circumstances by a preponderance of the evidence, but the trial judge may consider evidence that tends to refute a mitigating circumstance. *State v. Lopez,* 174 Ariz. 131, 145, 847 P.2d 1078, 1092 (1992), *cert. denied,* 510 U.S. 894, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993). In weighing, we consider the quality and the strength, not simply the number, of aggravating or mitigating factors. *State v. Willoughby,* 181 Ariz. 530, 549, 892 P.2d 1319, 1338 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 725, 133 L.Ed.2d 677 (1996).

### B. Aggravating circumstances

The trial judge found that the state had proved beyond a reasonable doubt the statutory aggravating circumstance of especially cruel, heinous, or depraved, under A.R.S. § 13–703(F)(6). With respect to the cruelty finding, the judge found that Blanton was conscious throughout the attack, based on evidence that she attempted to reach a phone and that she responded to paramedics who treated her at the scene. Furthermore, Porter, who saw Blanton immediately after the attack, testified that she was conscious when he entered the library and called 911. The judge found that Blanton would have suffered great terror as she was stabbed repeatedly by Hurles. She also must have suffered great pain. In addition to the fifteen defensive stab wounds on her hands, Blanton was stabbed eight times in the head, twelve times in the torso, and twice in her lower extremities. She also suffered blunt trauma consistent with kicking, which tore her liver.

The barrage of violence inflicted on Blanton, the fact that she was conscious throughout the attack, and her struggle to fight off her attacker all indicate she suffered terribly and far above the norm of even first-degree murder, leaving no room to doubt that this murder was especially cruel. The evidence supporting the trial judge's finding of cruelty, under A.R.S. § 13–703(F)(6), as an aggravating circumstance is overwhelming. The trial judge did not err in finding this statutory aggravator. Accordingly, it is unnecessary for us to consider the propriety of the trial judge's additional finding that the murder was especially heinous and depraved.

### C. Mitigating circumstances

The judge found no statutory mitigating circumstances. The judge also considered nonstatutory mitigating circumstances and found that Hurles had a deprived childhood and was raised in a clearly dysfunctional home environment.

A difficult family background, including childhood abuse, does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted a defendant's ability to perceive, to comprehend, or to control his actions. *See State v. Ross,* 180 Ariz. 598, 607, 886 P.2d 1354, 1363 (1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995). No such evidence was offered, and the trial judge did not err in concluding that Hurles' family background was not sufficiently mitigating to require a life sentence.

The judge also found that Hurles had good behavior while incarcerated prior to committing the murder. Taken either by itself or in

combination with Hurles' family background, we do not believe this sufficiently mitigates the quality of the aggravating circumstance. A life sentence would not be more appropriate.

## DISPOSITION

We reviewed the record for fundamental error and found none. *See State v. Kemp,* 185 Ariz. 52, 67, 912 P.2d 1281, 1296 (1996). For the reasons set forth, we affirm Hurles' conviction and sentence.

ZLAKET, V.C.J., and MOELLER and MARTONE, JJ., concur.