932 P.2d 794

STATE of Arizona, Appellee,

v.

Pete Carl ROGOVICH, Appellant.

No. CR–95–0288–AP.

Supreme Court of Arizona.

Feb. 4, 1997.

Grant Woods, Arizona Attorney General by Paul J. McMurdie, Rory L. Whipple, Crane McClennen, Phoenix, for State of Arizona.

Dean W. Trebesch, Maricopa County Public Defender by James H. Kemper, Phoenix, for Pete Carl Rogovich.

## OPINION

FELDMAN, Justice.

On June 1, 1994, a jury found Pete Carl Rogovich guilty of four counts of first-degree murder, two counts of aggravated assault, two counts of armed robbery, and one count of unlawful flight from a law enforcement vehicle. The trial court sentenced Rogovich to death for three of his four murder convictions. This is Rogovich's direct, automatic appeal of his murder convictions and death sentences. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), A.R.S. § 13-4031, and Rule 31.2(b), Ariz.R.Crim.P.

## BACKGROUND FACTS

On Sunday, March 15, 1992, at 8:30 a.m., a maintenance man saw Rogovich park his car in the lot of his central Phoenix apartment complex. On the way to his apartment, Rogovich spoke to the maintenance man, telling him he was upset with his girlfriend and was going to get even with her. Rogovich then went to his second-floor apartment.

At about 8:45 a.m., a customer entered a Super Stop Market located near Rogovich's apartment and found the body of the clerk, Tekleberhan Manna, a 24–year–old Ethiopian immigrant. Manna sustained a fatal gunshot wound to his right eye, fired from within two feet, causing instantaneous death. No money or merchandise had been taken from the store.

Around 1:00 p.m. the same day, Rogovich left his apartment with a gun in his hand and began randomly firing. At that time, Tony Madrid and Pamela Rodgers were leaving the apartment complex by car. One of Rogovich's shots hit a rear tire. Madrid thought the car was backfiring, and when he and Rodgers momentarily got out of the car to inspect, Rogovich fired at them but missed. Rogovich then ran to the south side of the complex and jumped the fence separating the apartment complex from the neighboring trailer park.

In the trailer park, Rogovich went on what can only be described as a homicidal rampage, leaving three victims in his wake. In the laundry room, 62–year–old Phyllis Mancuso was shot once through her right cheek and neck and died within minutes. In her driveway, 48–year–old Rebecca Carreon was shot once in the back and died from loss of blood within a few minutes. Finally, in her trailer 83–year–old Marie Pendergast was shot twice in the abdomen and also died from blood loss.

Rogovich was last seen running into an open field adjacent to the trailer park. Some time later, he appeared at a restaurant parking lot where disc jockey Kelly Urich was doing promotional work for Y–95, a Phoenix radio station. Rogovich took the distinctive Y–95 van from Urich at gunpoint and drove off.

Rogovich was next seen at a convenience store in Goodyear. Inside the store, he grabbed a couple of 12–packs of beer from the cooler and approached the counter. At the counter, he put down his gun and demanded in a quiet voice, "Give me some money." The cashier handed him about $45. Rogovich took the money, casually walked out to the Y–95 van, and drove off.

At about 5:00 p.m. Goodyear police, responding to a call concerning the convenience store robbery, spotted the Y–95 van and pursued. Although Rogovich led them on a lengthy chase at speeds ranging from 50 to over 100 miles per hour, police were finally able to stop him at a roadblock.

In interviews with the police, Rogovich admitted to committing all of the various offenses, including the murder of Tekleberhan Manna. He stated, "I did it. I know it was wrong. I know I'll burn in hell." When asked if he was sorry, Rogovich replied, "Of course, I'm sorry. It was wrong. I know it, but I just snapped. I was so angry. I just couldn't stop. I was full of anger." Rogovich told a detective that the death of his stepfather in 1986 and the recent breakup with his girlfriend really bothered him.

## PROCEDURAL HISTORY

On March 26, 1992, the State charged Rogovich with four counts of first-degree murder, two counts of aggravated assault, two counts of armed robbery, and one count of unlawful flight from a law enforcement vehi-

cle. The State also filed a notice of intent to seek the death penalty.

At arraignment, Rogovich pleaded not guilty. The trial judge subsequently granted Rogovich's motions for a competency pre-screening and a full psychiatric examination. Although the trial court found Rogovich competent to stand trial, several months later Rogovich gave notice of his intent to present the affirmative defense of insanity.

Two mental health experts examined Rogovich for the defense. Dr. Paul Bindelglas, a psychiatrist, concluded that Rogovich suffered from acute psychosis—in particular, paranoid schizophrenia. Dr. Marc Walter, a clinical neuropsychologist, likewise concluded that Rogovich suffered from paranoid schizophrenia.

The State also had two mental health experts examine Rogovich. Dr. Alexander Don, a psychiatrist, concluded that Rogovich suffered only from a personality disorder, not a mental illness. Dr. Michael Bayless, a psychologist, concluded that Rogovich suffered from no thought or mental disorder but only from phencyclidine (PCP) intoxication.

Rogovich's jury trial commenced on May 12, 1994. Both at the conclusion of the State's evidence and at the conclusion of all of the evidence, Rogovich moved for a judgment of acquittal; the judge denied both motions. After deliberating for just over five hours, the jurors found Rogovich guilty on all counts.

At the sentencing hearing following trial, the State raised three statutory aggravators. Rogovich sought to prove only one statutory mitigator, though he also sought to prove five nonstatutory mitigators. In rendering his special verdict, the judge found beyond a reasonable doubt that Rogovich killed the four victims and that he intended to kill them. Concluding that the mitigators were not sufficiently substantial to call for leniency, the judge sentenced Rogovich to death for the murders of Rebecca Carreon, Phyllis Mancuso, and Marie Pendergast and to a parole-eligible life sentence for the murder of Tekleberhan Manna.

## TRIAL ISSUES

### A. Expert testimony

#### 1. Bases of expert testimony

Rogovich argues that the trial judge erred when he permitted Dr. Philip Keen, the Maricopa County Chief Medical Examiner, to testify at trial in place of Dr. Larry Shaw and explain the autopsy reports and causes of death. Dr. Shaw prepared the autopsy reports but was no longer on staff at the Medical Examiner's Office at the time of trial.

Rogovich admits this court has specifically held that such testimony is admissible. *See State v. Villafuerte,* 142 Ariz. 323, 327, 690 P.2d 42, 46, *cert. denied,* 469 U.S. 1230, 105 S.Ct. 1234, 84 L.Ed.2d 371 (1985) (no error in medical examiner testifying about results shown in laboratory reports not prepared by him); *State v. Noleen,* 142 Ariz. 101, 104, 688 P.2d 993, 996 (1984) (no error in medical examiner offering opinion on cause of death based on his reading and interpretation of autopsy report prepared by another medical examiner). He instead contends that Dr. Keen based his opinion on the observations of someone who may have been unqualified to make those observations. But Rule 703, Ariz.R.Evid., which governs the bases of opinion testimony by experts, provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived or those made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

The rule does not require that the facts or data used as a basis for an opinion be generated by a qualified, testifying expert. In fact, Rogovich has cited no authority for such a proposition. Moreover, in *State v. Lundstrom* we held that "under most circumstances an expert may testify as to the substance of another expert's opinion if the testifying expert reasonably relied on that other opinion in forming his own opinion." 161 Ariz. 141, 148, 776 P.2d 1067, 1074 (1989); *see also Hernandez v. Faker,* 137 Ariz. 449, 671

P.2d 427 (App.1983). Thus, the question is whether Dr. Keen reasonably relied on reports and opinions from others.

▇▇▇ Dr. Keen's reliance on Dr. Shaw's report and opinions cannot seriously be disputed. *See Lundstrom,* 161 Ariz. at 146, 776 P.2d at 1072 (citing *Hernandez,* 137 Ariz. at 454, 671 P.2d at 432 (testifying expert may reasonably rely on medical opinions of a nontestifying doctor)); M. UDALL & J. LIVERMORE, ARIZONA PRACTICE—LAW OF EVIDENCE § 23, at 12 (2d ed. Supp.1989) ("It is hard to say ... that it is not reasonable [for experts] to rely on ... shared opinions"). Rule 703 merely brings to the courtroom the methods now followed by the learned professions and disciplines. Because of technological advances and the publication and wide dissemination of articles and reports, modern scientists have at their disposal and rely in their work on the findings and reports of colleagues from all over the world. Rule 703 allows a testifying expert to reach and express an opinion in the courtroom in the same manner he or she would in the laboratory or other work place. Any other rule would produce absurdity. For example, no orthopedic surgeon could testify unless the radiologist who read the X-rays on which the surgeon relied was first called to testify, and the radiologist could not testify until the technician who took the X-rays had testified. Presumably, the process could continue without end. We therefore reject the argument and avoid the nightmare that would exist without application of Rule 703.

### 2. Confrontation issues

Citing *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), Rogovich contends that the right of confrontation is satisfied only when evidence comes in under a firmly rooted hearsay exception. Because Rule 703 is not a hearsay exception, he says it is certainly not firmly rooted.

▇▇▇ Admitting the substance of a nontestifying expert's opinion is not a hearsay use at all. *Lundstrom,* 161 Ariz. at 148, 776

P.2d at 1074. Facts or data underlying the testifying expert's opinion are admissible for the limited purpose of showing the basis of that opinion, not to prove the truth of the matter asserted. *Id.* Testimony not admitted to prove the truth of the matter asserted by an out-of-court declarant is not hearsay and does not violate the confrontation clause. *State v. Hernandez,* 170 Ariz. 301, 307, 823 P.2d 1309, 1315 (App.1991). Thus, the defendant's confrontation right extends to the testifying expert witness, not to those who do not testify but whose findings or research merely form the basis for the witness's testimony. *See Reardon v. Manson,* 806 F.2d 39, 42 (2d Cir.1986), *cert. denied,* 481 U.S. 1020, 107 S.Ct. 1903, 95 L.Ed.2d 509 (1987) ("Expert reliance upon the output of others does not necessarily violate the confrontation clause where the expert is available for questioning concerning the nature and reasonableness of his reliance.").

Rogovich confronted and cross-examined Dr. Keen. Because Dr. Keen's testimonial reference to Dr. Shaw's autopsy reports was offered for purposes of showing the basis of Keen's opinion and not to prove the truth of the matter asserted, the testimony did not violate the confrontation clause.[1]

### B. The *Wussler* instruction

▇▇▇ Rogovich contends that the judge committed reversible and fundamental error by instructing the jurors that they were required to decide *unanimously* if he was guilty of the more serious crime of first-degree murder before they could consider the less serious crime of second-degree murder. At trial, the judge gave the following jury instruction:

> The crime of first degree murder includes the less serious crime of second degree murder. You may find the defendant guilty of the less serious crime only if you find unanimously the State has failed to prove the more serious crime beyond a reasonable doubt, but has proved the less serious crime beyond a reasonable doubt.

---

1. However, it is important to note that we have also held that "if the testifying expert merely acts as a conduit for another non-testifying expert's opinion, the 'expert opinion' is hearsay and is inadmissible, Rule 703 notwithstanding." *Lundstrom,* 161 Ariz. at 148, 776 P.2d at 1074 (citing J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE § 703[03], at 703–25 n. 23 (1988)).

This conformed with Recommended Arizona Jury Instructions, Standard Criminal 22 (1989); *State v. Wussler*, 139 Ariz. 428, 679 P.2d 74 (1984); and *State v. Staatz*, 159 Ariz. 411, 768 P.2d 143 (1988). In *Wussler*, a majority of this court approved an instruction requiring "the jury to acquit the defendant on the charged offense before considering the lesser-included offenses." 139 Ariz. at 430, 679 P.2d at 76. However, we recently disapproved both *Wussler* and *Staatz* in *State v. LeBlanc*, holding:

> It now appears that requiring a jury to do no more than use reasonable efforts to reach a verdict on the charged offense is the better practice and more fully serves the interests of justice and the parties. Under this method, jurors may render a verdict on a lesser-included offense if, after full and careful consideration of the evidence, they are unable to reach agreement with respect to the charged crime. Thus, the jury may deliberate on a lesser offense if it either (1) finds the defendant not guilty on the greater charge, or (2) after reasonable efforts cannot agree whether to acquit or convict on that charge.

186 Ariz. 437, 438, 924 P.2d 441, 442 (1996).

In *LeBlanc*, we did *not* hold that giving a *Wussler*-type instruction rises to the level of fundamental error. *Id.* at 440, 924 P.2d at 443–44. To the contrary, we remain "persuaded that the acquittal-first requirement does not violate the United States and Arizona Constitutions." *Id.* Furthermore, *LeBlanc* is to be applied prospectively only. *Id.* at 440, 924 P.2d at 444. Thus, the judge did not commit reversible error in giving the *Wussler*-type instruction.

### C. The insanity defense

Several months after Rogovich entered his not guilty plea, his lawyer filed notice of his intent to present an insanity defense. Rogovich contends that because the record does not affirmatively show that he agreed to present this defense, his convictions violate the Due Process Clause of the Fourteenth Amendment. Rogovich asserts that because an insanity defense involves a concession of the State's basic facts, makes virtually any evidence relevant and admissible, and operates as a waiver of fundamental rights, due process requires a defendant's affirmative, recorded agreement to its presentation.

Rogovich admits that we recently rejected this argument in *State v. Hurles*, in which we said:

> We also disagree with Hurles' assertions that the insanity defense vitiates the presumption of innocence or negates the state's burden of proof. Even though criminal defendants have the burden of proving insanity under A.R.S. § 13–502(B), which may, but need not result in a strategy of admitting certain facts of the crime charged, the presumption of innocence and the state's burden remain unchanged.

185 Ariz. 199, 203, 914 P.2d 1291, 1295 (1996). *Hurles*, Rogovich concedes, deprives him of this argument.

■ Rogovich did not personally object to his lawyer presenting an insanity defense. He was not only present at his competency hearing and at trial but was also examined by four mental health experts in response to his insanity claim. Clearly, as in *Hurles*, failure of counsel to get express, on-the-record permission from Rogovich to advance the insanity defense is not fundamental error. Given the facts, counsel's decision to raise the defense was certainly reasonable. Because Rogovich, who was present at all critical moments, failed to object, the claim is precluded. *Id. See State v. Ryan*, 248 Neb. 405, 534 N.W.2d 766 (1995) (holding that defendant acquiesced to insanity defense by cooperating with psychiatrists and that attorneys made reasonable strategic choice in asserting insanity defense).

### SENTENCING ISSUES

### A. Independent review

■ Rogovich presents no sentencing issues for review. Furthermore, at oral argument defense counsel, as an officer of the court, avowed that a careful study of the record produced no arguable issues. Nevertheless, we conduct an independent review of the aggravating and mitigating factors in all capital cases to determine whether the death

penalty is warranted. *State v. Wood,* 180 Ariz. 53, 68, 881 P.2d 1158, 1173 (1994).

## B. Aggravating circumstances

When seeking to death qualify a defendant, the State must prove the aggravating circumstances enumerated in A.R.S. § 13–703(F) beyond a reasonable doubt. *See* A.R.S. § 13–703(C); *State v. Kiles,* 175 Ariz. 358, 369, 857 P.2d 1212, 1223 (1993), *cert. denied,* 510 U.S. 1058, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994). In aggravation, the judge found that Rogovich had been convicted of: (1) another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable § 13–703(F)(1); (2) a felony involving the use or threat of violence on another person, § 13–703(F)(2); and (3) one or more other homicides committed during the commission of the offense, § 13–703(F)(8). We agree these circumstances exist.

### 1. Other crimes for which sentences of life imprisonment or death were imposable—§ 13–703(F)(1)

■ The State's argument for the existence of (F)(1) was intertwined with its argument for (F)(8)—other homicides. The State argued that if the judge did not find the existence of (F)(8) in connection with the trailer park killings, it must find that (F)(1), the convenience store killing, existed. *See State v. Cook,* 170 Ariz. 40, 63 n. 11, 821 P.2d 731, 754 n. 11 (1991). However, Rogovich urged that (F)(1) could not be found because it only applied to convictions obtained outside of Arizona. The judge rejected this narrow interpretation and found that the State had established the existence of (F)(1)for the trailer park killings but not for the convenience store killing.

There is no support for Rogovich's contention that the convictions necessary to satisfy

an (F)(1) finding must be extraterritorial. Although a review of relevant cases reveals that some involve convictions obtained outside of Arizona, none suggest this is a requirement. The broader interpretation of (F)(1), encompassing both convictions internal and external to Arizona, is the correct one. We thus agree this aggravating circumstance is present. *See State v. Smith,* 146 Ariz. 491, 501–02, 707 P.2d 289, 299–300 (1985) (prior armed robbery convictions in Yuma, Arizona, were properly considered as an (F)(1) aggravating circumstance).

### 2. Prior conviction of felony involving violence—§ 13–703(F)(2)

■ The State argued that Rogovich's convictions for aggravated assault and armed robbery satisfy the existence of former § 13–703(F)(2), which provided that the aggravating circumstance was present if "[t]he defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person." [2]

Rogovich argued the State failed to establish that the aggravated assault and armed robbery convictions constituted previous convictions under (F)(2). However, in *State v. Gretzler* we interpreted (F)(2) (and (F)(1)) as applying to convictions entered prior to the sentencing hearing, regardless of the order in which the underlying crimes occurred or the convictions entered. *See also State v. Valencia,* 124 Ariz. 139, 141, 602 P.2d 807, 809 (1979). Thus, Rogovich's convictions on these charges were previous convictions.

■ Rogovich also argued that a conviction qualified under (F)(2) only when its statutory definition necessarily involved the use or threat of violence. This is a correct statement of the law, and a review of the relevant statutes, pleadings, jury instructions, and verdicts leaves no doubt that this aspect of (F)(2) is satisfied.[3]

---

**2.** The language of (F)(2) was amended in 1993 to read: "The defendant was previously convicted of a serious offense, whether preparatory or completed."

**3.** Rogovich was convicted of aggravated assault under § 13–1203(A)(2) (A person commits assault by "[i]ntentionally placing another person in reasonable apprehension of imminent physical

injury ...." ) and § 13–1204(A)(2) ("A person commits aggravated assault if such person commits assault as defined in § 13–1203 under any of the following circumstances: ... If such person uses a deadly weapon or dangerous instrument."). Thus, unlike *State v. Fierro,* 166 Ariz. 539, 550 n. 9, 804 P.2d 72, 83 n. 9 (1990), there appears to be no concern that Rogovich may have committed an assault without the use or

The judge noted the issue to be resolved is *when* a conviction qualified for consideration for purposes of (F)(2) analysis. This issue was addressed in *State v. McKinney,* in which we held:

A conviction occurs when the jury renders its verdict.... The guiding principle in all these cases has been that the purpose of a sentencing hearing is to determine the character and propensities of the defendant and impose a sentence that fits the offender. The same principles apply to the (F)(2) factor present in this case.... Thus, for purposes of § 13–703(F)(2), [defendant's] second degree murder conviction occurred when the jury returned its verdict and was prior to his capital sentencing hearing.

185 Ariz. 567, 580, 917 P.2d 1214, 1227 (1996) (citations omitted).

The same rationale applies in this case. Thus, the judge correctly found the existence of (F)(2) in connection with all four murders.

### 3. Multiple homicides—§ 13–703(F)(8)

 The State argued that it had established the presence of § 13–703(F)(8) in connection with the trailer park killings. In *State v. Lavers,* we held that in determining whether (F)(8) applied to a particular set of circumstances, we would "analyze 'the temporal, spatial, and motivational relationships between the capital homicide and the collateral [homicide], as well as ... the nature of that [homicide] and the identity of its victim.'" 168 Ariz. 376, 393, 814 P.2d 333, 350 (1991).

A situation similar to the case before us existed in *State v. Ramirez,* in which the defendant was convicted of multiple homicides. We stated:

Defendant was convicted of two counts of premeditated first-degree murder. The murders occurred in the same place and resulted from the same disturbance. Moreover, both murders "were committed by [defendant] in a relatively short period

of time in what can be fairly viewed as one continuous course of criminal conduct."

178 Ariz. 116, 130, 871 P.2d 237, 251 (1994).

Given Rogovich's continuous course of conduct, the judge correctly found this aggravating circumstance with respect to the trailer park killings only.

### C. Mitigating circumstances

Rogovich has the burden of proving any statutory or non-statutory mitigating circumstances by a preponderance of the evidence. *Kiles,* 175 Ariz. at 373, 857 P.2d at 1227; § 13–703(G). The death penalty is required if at least one aggravating factor is found and the mitigating circumstances are not sufficiently substantial to call for leniency. § 13–703(E). Rogovich offered a single statutory mitigating circumstance, that his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired" when he killed each of the four victims. § 13–703(C)(1). He also offered five non-statutory mitigators: (1) dysfunctional home life and difficult early years; (2) lack of serious prior record; (3) good employment history; (4) good behavior while incarcerated; and (5) admission of guilt and feeling of remorse. The judge found that Rogovich had proven all of the presented mitigators by a preponderance of the evidence, except that he had not established that his capacity to appreciate the wrongfulness of his conduct was impaired. We agree with each of the judge's findings.

### D. Weighing and sentencing

 For the murder of Tekleberhan Manna, the judge found that the (F)(2) aggravating circumstance applied, as well as the six mitigating circumstances. Balancing the aggravating and mitigating circumstances, the judge concluded that the mitigating circumstances were sufficiently substantial to call for leniency. We agree.

 For the murders of Rebecca Carreon, Phyllis Mancuso, and Marie Pendergast, the judge found three aggravating

---

threat of violence, or requisite mental state of intentionally or knowingly, thereby negating the

(F)(2) aggravator. *See State v. McKinney,* 185 Ariz. 567, 917 P.2d 1214 (1996).

circumstances[4] and six mitigating circumstances. We believe the (F)(8) circumstance carries the most weight. The judge concluded that the mitigating circumstances were not substantial enough to call for leniency in the trailer park killings. We agree. Further, we do not believe the quality and magnitude of the mitigating circumstances are sufficient to warrant leniency. A life sentence would not be more appropriate under the circumstances of this case.

## CONCLUSION

For the reasons set forth above, we affirm Rogovich's convictions and sentences.

ZLAKET, C.J., JONES, V.C.J., and MARTONE, J., concur.

MOELLER, J., did not participate in the determination of this matter.

4. The judge avoided double counting, as do we. *See* Special Verdict at 11. The Manna conviction satisfied the (F)(1) factor for the trailer park killings. The (F)(8) factor is also applicable to the trailer park killings, as is the (F)(2) factor.