**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

RICHARD D. HURLES,
          *Petitioner-Appellant,*

v.

CHARLES L. RYAN,*
          *Respondent-Appellee.*

No. 08-99032

D.C. No.
CIV-00-0118-PHX-
RCB

OPINION

Appeal from the United States District Court
for the District of Arizona
Robert C. Broomfield, Senior District Judge, Presiding

Argued and Submitted
October 7, 2010—Pasadena, California

Filed July 7, 2011

Before: Harry Pregerson, Dorothy W. Nelson and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge D.W. Nelson;
Dissent by Judge Ikuta

---

*Charles L. Ryan is substituted for his predecessor, Dora B. Schriro, as Director for the Arizona Department of Corrections. Fed. R. App. P. 43(c)(2).

**COUNSEL**

Denise I. Young and Michael Aaron Harwin, Tucson, Arizona, for the petitioner-appellant.

Terry Goddard, Attorney General of Arizona, Phoenix, Arizona, for the respondent-appellee.

Kent E. Cattani and J.D. Nielsen, Arizona Attorney General, Capital Litigation Section, Phoenix, Arizona, for the respondent-appellee.

**OPINION**

D.W. NELSON, Senior Circuit Judge:

Richard D. Hurles appeals the district court's denial of his petition for a writ of habeas corpus from his murder conviction and death sentence. He argues the district court erred on four issues: judicial bias, ineffective assistance of sentencing counsel, ineffective assistance of appellate counsel, and procedural default (related to portions of his ineffective assistance of counsel claims).

For the reasons set forth below, we reverse the district court's denial of Hurles's judicial bias claim. The highly unusual facts of this case—in which the trial judge became involved as a party in an interlocutory appeal, was denied standing to appear as an adversary, and then proceeded to pre-

side over a murder trial and single-handedly determine Hurles's death sentence—compel us to conclude that Hurles was denied his right to due process. These exceptional facts raise the probability of actual bias to an unconstitutional level.

Because counsel requested only a new sentencing at oral argument, rather than a new trial, we remand to the district court with instructions to grant a writ of habeas corpus as to Petitioner's sentence unless the State of Arizona elects, within 90 days of the issuance of the mandate, to resentence Petitioner before a jury and presided over by a judge other than Judge Hilliard, within a reasonable time thereafter to be determined by the district court. We do not reach Hurles's remaining claims, as they are now rendered moot by the relief we grant for his judicial bias claim.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On November 12, 1992, just a few months after Hurles was released from thirteen years of incarceration for previous crimes, eyewitnesses placed him at the Buckeye Public Library around 2:00 p.m. One witness saw him in the children's section just before she left at approximately 2:30 pm. She observed him "stare" at her, and she smelled alcohol from feet away. When the last witness left the library, the only two people remaining were Hurles and Kay Blanton, the librarian. By about 2:45 p.m., when visitors attempted to enter the library, they found the front door locked and saw Blanton lying in a pool of blood.

Dr. Walter, a defense expert, described Hurles's account of that time:

> On the day before the present offense, Richard drank approximately eighteen beers throughout the day and had only one meal in the evening. The next morning he was still intoxicated. Richard ate a large breakfast shortly before his nephew invited him to go meet a

woman and drink more beer. Allegedly, they both had consensual sex with the woman before leaving. While en [ ] route to his brother's house, an old acquaintance, a drug dealer, gave Richard a hit of L.S.D. and congratulated him on getting out of prison. Once back at home, Richard drank several more beers before going to the library to return some books. He is unsure how long he was there and has no memory of the actual offense.

Another witness saw Hurles leave the library through the back door and followed him down the street, where they had a brief conversation. *State v. Hurle*s, 914 P.2d 1291, 1293-94 (Ariz. 1996). Hurles then went home on a borrowed bicycle and requested that his nephew Thomas drive him to a Phoenix bus station. *Id.* On the way, Hurles dumped his bloody clothes along the side of the road. *Id.* After dropping Hurles off, Thomas later helped police find the discarded clothes, and Hurles was arrested on a bus headed to Las Vegas. *Id.*

In the library, Blanton was found with her clothes removed from the waist down and thirty-seven stab wounds on her body. *Id.* at 1293. The weapon was a paring knife Hurles had found in the library. *Id.* She was still conscious when paramedics arrived at the scene, after having attempted to reach a phone. *Id.* at 1299. She was transferred to the hospital and died shortly thereafter.

Richard Hurles was arrested and charged with first degree premeditated murder, first degree felony murder, burglary, and attempted sexual assault. Because he was indigent, the court appointed an attorney to represent him. When the prosecution decided to seek the death penalty, Hurles's attorney made an ex parte request to Judge Hilliard, the trial judge, for the appointment of co-counsel. The practice of designating at least two attorneys for capital cases was standard at the Maricopa County Public Defender's Office.[1] Hurles's attorney

---

[1]The public defender's office was unable to represent Hurles due to a conflict of interest. Hurles's attorney was appointed by the court as a solo practitioner.

cited the need to prepare for not only the guilt phase of Hurles's capital proceedings, in which she would later raise an insanity defense and need to prepare expert testimony and scientific evidence, but also the complex sentencing phase. After Judge Hilliard denied the request without explanation, Hurles's attorney petitioned the court of appeals in a special action, arguing that the judge had abused her discretion.

Under Arizona law, a trial judge is a nominal party in special action proceedings. However, this nomenclature is a "mere formality" warranting no action on the part of the judge. *State ex rel. Dean v. City Court*, 598 P.2d 1008, 1011 (Ariz. Ct. App. 1979); *see also Hurles v. Superior Court*, 849 P.2d 1, 2 (Ariz. Ct. App. 1993). In this case, however, Judge Hilliard appeared and filed a responsive pleading defending her ruling. The judge was represented in the special action by Colleen French from the Arizona Attorney General's Office. As Ms. French admitted in later proceedings, she had at least some communications with Judge Hilliard about Hurles's case in the context of representing Judge Hilliard in the special action proceeding, although the record is ambiguous as to the nature and extent of those communications.

In her responsive pleading, Judge Hilliard commented on the overwhelming evidence of guilt the state had assembled against Hurles, evidence which rendered the case "very simple and straightforward." In addition, Judge Hilliard questioned the competence of Hurles's attorney, stating, "Clearly there are other attorneys who provide contract services for Maricopa County who would be able to provide competent representation in a case as simple as this." These comments took place months before any evidence had been presented in the case.

The Arizona Court of Appeals published a decision denying Judge Hilliard standing to appear in the special action and ruling it improper for judges to file pleadings in special actions solely to defend the correctness of their decisions.

*Hurles v. Superior Court*, 849 P.2d 1 (Ariz. Ct. App. 1993). Addressing Judge Hilliard's participation specifically, the court held that it was "of the inappropriate 'I-ruled-correctly' sort," which violated the "essential [principle] to impartial adjudication" that judges must have "no personal stake—and surely no *justiciable* stake—in whether they are ultimately affirmed or reversed." *Id.* at 4 (emphasis in original). The court then declined jurisdiction over the petition. *Id.*

Despite the Court of Appeals's ruling that Judge Hilliard had acted improperly, she continued to preside over Hurles's trial. On April 14, 1994, a jury found Hurles guilty of all charges.

Judge Hilliard then conducted an aggravation/mitigation hearing on September 30, 1994, to hear evidence regarding Hurles's recommended sentence. Under Arizona's capital sentencing scheme at the time, Judge Hilliard was the sole arbiter of Hurles's sentence. No jury participated in determining his sentence.

Hurles's counsel offered the following evidence regarding a number of alleged mitigating factors, including diminished capacity, dysfunctional family background, low intelligence and lack of education, and good behavior while incarcerated:

Richard Hurles was born into a family of poor migrant farm workers as one of nine children and eight sons.[2] Richard was always slow and was routinely placed in special classes in school. Various doctors at points in his life have diagnosed him as mentally retarded, borderline mentally retarded, and learning disabled.

Richard's father John was an abusive alcoholic and sexual predator, and he passed these traits on to most of the Hurles

---

[2] We use the petitioner's first name in this section so as to distinguish him from other members of the Hurles family.

children. John molested his only daughter Debbie for many years until she escaped into foster care. According to Edith Hurles (the ex-wife of one of Richard's brothers), John also saw no problem with forcing women to have sex with him, believing that "if a man wanted a woman, he should take her. If she did not want it, force her." John raped Richard's first girlfriend after forcing Richard to pull the car over so that he could take her out by the side of the road. John also routinely beat the children with a leather belt or a switch from a tree, and on one occasion he bashed one of his children over the head with a hammer. Richard's mother Irene offered no protection from John's abuse, as she was often the victim herself. Edith Hurles remembered that John would beat Irene "whenever he got drunk, and he was drunk all the time."

Richard began drinking alcohol and sniffing paint, glue, and gasoline at age nine. John taught his sons to drink at early ages and fed at least one of the children vodka as a toddler; alcohol and drug abuse were never discouraged. As Richard explained, "[I]t was routine for three or four of us to be high on alcohol, marijuana, or cocaine." Dr. Stonefeld testified during the pre-sentence hearing that "[t]he norm in [Hurles's] family was abuse of alcohol." Richard's education ended permanently in the seventh grade after he was caught sniffing paint on school property. He sniffed paint once or twice per week beginning at age twelve. At age fourteen, Richard added approximately five marijuana joints per week to his drug intake, and he began experimenting with other drugs, including mushrooms and heroin. At fifteen, he began snorting three to four lines of cocaine and smoking twenty-five marijuana joints per week and increased his alcohol intake to a six-pack of beer per week. By the ages of sixteen to seventeen, "[h]e [drank] approximately a case of beer, two to three fifths of wine, two pints of whiskey, smoked eighty marijuana joints, and snorted two grams or twelve lines of cocaine each week." He maintained this level of drug abuse until he was first incarcerated. At that time he reported to Dr. Tuchler that he was "drinking all day if he ha[d] the money."

Richard has reported hearing voices giving him violent commands intermittently since age seventeen. During his first stint in prison in 1978, he was prescribed an anti-psychotic drug, Mellaril, to suppress the voices. He later took the same drug again in prison after the murder in 1993. Hurles has stated that he heard voices telling him to "push other inmates down the stairs." He avoided stairs so that he would not do what the voices told him to do.

Most doctors who have examined Hurles have found him mentally and emotionally wanting. Dr. Bendheim, who examined him in 1978 relating to child molestation criminal proceedings, described him as "mentally retarded and illiterate." Dr. Tuchler concluded at the same time that Hurles was incompetent to stand trial due to his "sociocultural and intellectual defect[s]" and "borderline mental retardation." He was housed in the prison's section for the mentally retarded for over half of the thirteen years he was in jail for previous crimes. Dr. Walter, who examined him in 1993, described him as "showing significant levels of neuropsychological deficit" and an "overall degree of dysfunction . . . which represents performance in the 'brain damaged range.' " Dr. Walter also thought he likely suffered from both depression and a thought disorder. Dr. Walter's battery of neuropsychological testing placed Hurles "in the brain damage range in six out of seven measures felt to be most sensitive to brain functioning." Post-conviction testing revealed an abnormality in the left frontal lobe of his brain.

Dr. Walter concluded that alcohol and drug abuse have a more pronounced effect on someone with Hurles's developmental limitations, exacerbating his mental deficits and leading to "more blatant cerebral dysfunction." Similarly, Dr. Bendheim explained, "This type of intoxication in a mentally retarded person further reduces his judgment, his capacity to adhere to the norms of society and of the law and to fully appraise the nature and consequences of his action[s] . . . ." He even opined, relating to Hurles's conviction for child

molestation, "According to the history as I was taking it, it is most unlikely that the alleged offense would have been committed if he had not been severely intoxicated or, given his type of intoxication, if he had possessed norma[l] intellectual capacity which he has lacked apparently since birth."

In addition to affecting his judgment, drug abuse has also had an impact on his memory. Dr. Stonefeld explained in his September 9, 1994 evaluation that Hurles "has significant memory problems with large gaps in events and time sequences. These episodes are largely related to periods of intoxication." Indeed, Hurles would sometimes lose time when high on inhalants, including, as he reported to Dr. Bendheim in 1978, "[o]ne time after sniffing paint [when] he found himself in Buckeye for two days without remembering how he got there."

In contrast to his behavior outside prison, Hurles received glowing reviews from prison staff who worked closely with him during his long term with the Arizona Department of Corrections. Staff described him as "very, very compliant," "a very good worker" who "remember[ed] daily tasks" and whose "attendance was always good," and someone who "was never out of control" and never "displayed any . . . problems controlling his temper." Richard received numerous evaluations from prison staff describing him as "excellent." One staff member commented specifically, "Richard has demonstrated his ability to function well while in prison." Marilynn Windust, a Correctional Program Officer specializing in mental health and primary substance abuse at the Arizona Department of Corrections while Hurles was imprisoned there, worked with Hurles daily for two years. She stated that, to her knowledge, he had never received disciplinary infractions or had any difficulty complying with prison programs. Dr. Stonefeld considered it consistent with his diagnoses of Hurles that he did and could thrive in the "structured, very orderly" environment of the prison system.

Following the aggravation/mitigation hearing, Judge Hilliard—as the sole sentencer—sentenced Hurles to death on October 13, 1994. The Arizona Supreme Court affirmed on direct appeal. *State v. Hurles*, 914 P.2d 1291 (Ariz. 1996).

Hurles filed his first petition for post-conviction review ("PCR") on January 8, 1999, alleging four claims, including both ineffective assistance of counsel claims raised in this appeal. Judge Hilliard again presided over this PCR, and Colleen French from the Attorney General's office—Judge Hilliard's attorney in the prior special action proceeding—represented the State. Judge Hilliard denied the PCR, and the Arizona Supreme Court affirmed without comment.

Hurles began federal habeas proceedings in 2000, but then returned to state court to file a second PCR raising additional claims, including judicial bias and new ineffective assistance of counsel claims. He requested Judge Hilliard's removal from the case and was denied. Judge Hilliard then denied his second PCR. The Arizona Supreme Court affirmed without comment.

Hurles filed an amended petition for habeas corpus in the District of Arizona, raising ten claims. The district court denied most of them as procedurally barred. After additional briefing, the district court dismissed the remainder of Hurles's claims. The district court then certified four issues for appeal to this Court.

## II. STANDARD OF REVIEW

This Court reviews the district court's decision to deny a 28 U.S.C. § 2254 habeas corpus petition de novo, *Bribiesca v. Galaza*, 215 F.3d 1015, 1018 (9th Cir. 2000), and its findings of fact for clear error, *McClure v. Thompson*, 323 F.3d 1233, 1240 (9th Cir. 2003).

When reviewing decisions of the Arizona state courts, the Anti-Terrorism and Effective Death Penalty Act of 1996

("AEDPA") applies to any petition filed after April 24, 1996. 28 U.S.C. § 2254; *see also Woodford v. Garceau*, 538 U.S. 202, 204 (2003); *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under AEDPA, a federal court may grant relief if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In addition, a federal court may grant relief with respect to the factual findings of the state court if those findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). If the "state court's fact-finding process survives this intrinsic review," its "findings are dressed in a presumption of correctness" under Section 2254(e)(1). *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).

## III.   JUDICIAL BIAS

Petitioner argues that the trial judge should have recused herself from his criminal proceedings after she became an active party in his interlocutory appeal. Her continued involvement with his case, he contends, denied him due process of law. Given the judge's conduct in the special action proceeding, which the Arizona Court of Appeals specifically deemed improper, the potential for bias was unconstitutionally high. Therefore, we reverse the district court's denial of Hurles's claim.

## A.   Clearly Established Supreme Court Precedent

**[1]** "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). Indeed, the "legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship." *Mistretta v. United States*, 488 U.S. 361, 407 (1989). This most basic tenet of our judicial system helps to ensure both litigants' and the public's confidence that each case has

been fairly adjudicated by a neutral and detached arbiter. An appearance of impropriety, regardless of whether such impropriety is actually present or proven, erodes that confidence and weakens our system of justice.

[2] While most claims of judicial bias are resolved "by common law, statute, or the professional standards of the bench and bar," the Due Process Clause of the Fourteenth Amendment "establishes a constitutional floor." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) (citations omitted). To safeguard the right to a fair trial, the Constitution requires judicial recusal in cases where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). "The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Caperton v. A.T. Massey Coal Co.*, 129 S. Ct. 2252, 2262 (2009) (internal quotation marks omitted).[3] The Supreme Court has declared:

> Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused, denies the latter due process of law.

*Tumey v. Ohio*, 273 U.S. 510, 532 (1927).

---

[3]We cite to *Caperton*, the Supreme Court's recent decision regarding judicial bias, throughout this opinion. Although, as the dissent points out, *Caperton* is not controlling insofar as it announces new "clearly established Supreme Court precedent" that post-dates the state court decision at issue here, dissent at 9092 n.13, we refer to it where we find its analysis of established Supreme Court jurisprudence helpful to our resolution of the case. We read *Caperton* to announce no new rule of law that would affect our analysis here.

**[3]** A claimant need not prove actual bias to make out a due process violation. *Johnson v. Mississippi*, 403 U.S. 212, 215 (1971); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986). Indeed, the Supreme Court has pointed out that it would be nearly impossible for a litigant to prove actual bias on the part of a judge. *Caperton*, 129 S. Ct. at 2262-63; *see also Vasquez v. Hillery*, 474 U.S. 254, 263 (1986) ("[W]hen the trial judge is discovered to have had some basis for rendering a biased judgment, his actual motivations are hidden from view, and we must presume the process was impaired." (citing *Tumey*, 273 U.S. at 535). It is for this reason that the Court's precedents on judicial bias focus on the *appearance of and potential for* bias, not actual, proven bias. Due process thus mandates a "stringent rule" for judicial conduct, and requires recusal even of judges "who would do their very best to weigh the scales of justice equally" if the risk of bias is too high. *Murchison*, 349 U.S. at 136.

In determining what constitutes a risk of bias that is "too high," the Supreme Court has emphasized that no mechanical definition exists; cases requiring recusal "cannot be defined with precision" because "[c]ircumstances and relationships must be considered." *Id.*; *see also Lavoie*, 475 U.S. at 822 (internal citations omitted). The Supreme Court has just re-affirmed this functional approach. *See Caperton*, 129 S. Ct. at 2265-66.

The Court's call for pragmatism is particularly important in this instance, for capital cases mandate an even "greater degree of reliability" than other cases do. *Murray v. Giarratano*, 492 U.S. 1, 9 (1989); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). We are compelled to acknowledge "that the penalty of death is qualitatively different" from any other penalty and that "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment." *Woodson*, 428 U.S. at 305. As required by the Supreme Court, we therefore utilize a func-

tional approach to the facts of this case as they relate to the Court's established case law.

**[4]** The Supreme Court's judicial bias doctrine has evolved as it confronts new scenarios "which, as an objective matter, require recusal." *Caperton*, 129 S. Ct. at 2259. The most basic example of probable bias occurs when the judge " 'has a direct, personal, substantial pecuniary interest in reaching a conclusion against [one of the litigants].' " *Crater v. Galaza*, 491 F.3d 1119, 1131 (9th Cir. 2007) (quoting *Tumey*, 273 U.S. at 523). The Court has also held that other financial interests may mandate recusal, even when they are not "as direct or positive as [they] appeared to be in [*Tumey*]." *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973); *see also Ward v. Monroeville*, 409 U.S. 57 (1972); *Lavoie*, 475 U.S. 813. However, financial conflicts of interest are not the only relevant conflicts for judicial bias purposes. *See Caperton*, 129 S. Ct. at 2260 (explaining that judicial bias doctrine encompasses "a more general concept of interests that tempt adjudicators to disregard neutrality"). The Court has thus required recusal if the judge "becomes 'embroiled in a running, bitter controversy' " with one of the litigants, *id.* at 2262 (quoting *Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1971)); if she becomes "enmeshed in matters involving [a litigant]," *Johnson v. Mississippi*, 403 U.S. 212, 215 (1971); or "if the judge acts as 'part of the accusatory process,' " *Crater*, 491 F.3d at 1131 (quoting *Murchison*, 349 U.S. at 137). At bottom, then, the Court has found a due process violation when a judge holds two irreconcilable roles, such that her role as an impartial arbiter could become compromised. *Murchison*, 349 U.S. at 137; *see also Crater*, 491 F.3d at 1131.

## B. AEDPA Deference

**[5]** AEDPA applies to any claim "adjudicated on the merits" by a state court, 28 U.S.C. § 2254(d), meaning the state court decision "rest[ed] on substantive, rather than procedural, grounds." *Lambert v. Blodgett*, 393 F.3d 943, 966 (9th Cir.

2004). The applicable state court decision is the "last reasoned decision" addressing a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citations omitted). Because the Arizona Supreme Court summarily denied Hurles's appeal on this claim without comment, we "look through" that opinion to the last reasoned decision, Judge Hilliard's denial of Hurles's second PCR. *Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991). Ordinarily, the state court's factual findings would be entitled to a presumption of correctness under AEDPA. 28 U.S.C. § 2254(e)(1). However, such deference is only warranted if the state court's fact-finding process survives the intrinsic review of Section 2254(d)(2). *See Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004). In other words, the state court decision must not be "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2).

**[6]** In this case, the state court fact-finding process was fundamentally flawed. Judge Hilliard granted no evidentiary hearing or other opportunity for Hurles to develop his claim. Hurles had alleged that Judge Hilliard was improperly involved in the special action proceeding before the Arizona Court of Appeal, in which Hurles had appealed her denial of his request for additional counsel. As discussed above, Judge Hilliard filed a responsive pleading through her counsel, the Arizona Attorney General's office, arguing the merits of her decision. Hurles alleged that statements in Judge Hilliard's brief were attributable to her, and that the brief contained inappropriate statements about the merits of Hurles's case and the competence of his attorney before trial had begun. He argued that Judge Hilliard's involvement in the special action —which the Court of Appeals had found improper—rendered her unfit to continue presiding over his trial and sentence and that she should have recused herself.

**[7]** Instead of providing a forum for Hurles to present and develop evidence to establish his claim, Judge Hilliard "found" facts based on her own recollections and factual assertions about her conduct. She concluded that she was not

in fact involved in the Special Action proceeding, that the brief filed in her name was not her brief, and that statements in the brief could not be attributed to her. In effect, she testified through her order denying Hurles's second petition for post-conviction relief. *See* Minute Entry, Aug. 9, 2002, at 2, Hurles v. Schriro, No. CIV-00-0118-PHX-RCB (D. Ariz. 2008), ECF 72-1 at 19 ("Minute Entry") ("[T]he Attorney General filed a response on this judge's behalf but without any specific authorization of such a pleading. No contact was made by this judge with the Attorney General and this judge was a nominal party only."). Hurles had no opportunity to challenge Judge Hilliard's own claimed memory and understanding of events which had taken place years prior. This procedure is inherently inadequate to evaluate the merits of Petitioner's claim. In fact, it is not a procedure at all. *See In re Murchison*, 349 U.S. 133, 138 (1955) ("Thus the judge whom due process requires to be impartial in weighing the evidence presented before him, called on his own personal knowledge and impression of what had occurred in the grand jury room and his judgment was based in part on this impression, the accuracy of which could not be tested by adequate cross-examination."); *Buffalo v. Sunn*, 854 F.2d 1158, 1165 (9th Cir. 1988) (finding error when the court relied on "personal knowledge" to resolve a disputed issue of fact).

**[8]** We have repeatedly held that where a state court makes factual findings without an evidentiary hearing or other opportunity for the petitioner to present evidence, "the fact-finding process itself is deficient" and not entitled to deference. *Maddox*, 366 F.3d at 1001 ("If, for example, a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination of the facts.' "); *see also Perez v. Rosario*, 459 F.3d 943, 950 (9th Cir. 2006) ("In many circumstances, a state court's determination of the facts without an evidentiary hearing creates a presumption of unreasonableness.") (citations omitted); *Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003), *cert. denied*,

543 U.S. 1038 (2004) ("[W]ith the state court having refused [petitioner] an evidentiary hearing, we need not of course defer to the state court's factual findings—if that is indeed how those stated findings should be characterized—when they were made without such a hearing."); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002), *cert. denied*, 537 U.S. 1179 (2003) ("Having refused [petitioner] an evidentiary hearing on the matter, the state cannot argue now that the normal AEDPA deference is owed the factual determinations of the [state] courts."); *Weaver v. Thompson*, 197 F.3d 359, 363 (9th Cir. 1999) (finding no deference warranted where factual findings "were not subject to any of the usual judicial procedures designed to ensure accuracy" because "[t]he judge was not under oath when he wrote the letter, the bailiff was not under oath when relaying her account of events to the judge, and neither the judge nor the bailiff was ever questioned by counsel for either side"); *cf. Fero v. Kerby*, 39 F.3d 1462, 1479 n.24 (10th Cir. 1994) ("[Petitioner] raised the issue of judicial bias in his first post-trial motion for a new trial and had the benefit of an evidentiary hearing on that claim."). This case presents an especially compelling example of a defective fact-finding process, where the facts "found" by Judge Hilliard involved her own conduct and her "findings" were based on her own untested memory and assertions.

[9] The dissent suggests that we are re-casting legal disputes as factual ones in order to escape the constraints of AEDPA. However, we are bound to confront factual disputes relevant to this claim. Judge Hilliard's resolution of Hurles's due process claim was predominantly a factual one. She did not review her participation in the special action and the statements in her brief and conclude that they did not constitute a potential for bias, nor did she review the Arizona Court of Appeals's decision and conclude that it indicated no unconstitutional potential for bias. Rather, she supplied *additional* facts that, in her judgment, rendered her conduct proper and prevented the brief's contents from being attributable to her. *See* Minute Entry at 2 ("In the special action in this case, the

Attorney General filed a response on this judge's behalf but *without any specific authorization of such a pleading. No contact was made by this judge with the Attorney General and this judge was a nominal party only.*") (emphasis added). None of these facts was established by the record. To the contrary, Hurles contended that Judge Hilliard had "injected [her]self as a direct adversary" in the special action, that she "filed her own substantive response" in the proceeding, that she knew the contents of the briefing filed in her name, and that those contents were therefore attributable to her. The Arizona Court of Appeals explicitly noted that the record was ambiguous as to Judge Hilliard's involvement; the Attorney General had noted at oral argument that the Judge was not involved, but there was no other evidence to that effect and the brief was filed in the Judge's name. *See Hurles*, 849 P.2d at 2 & n.2.

Thus, while the dissent appears to characterize Judge Hilliard's decision as solely a legal determination based on undisputed facts, Judge Hilliard's own (factual) reasoning belies that characterization of this case. Indeed, she clarifies in her order that the defect in Hurles's due process claim is a lack of sufficient "factual evidence to support his allegations," but she then fails to afford him a hearing or other opportunity to develop such factual evidence. Minute Entry at 2. The dissent relies on Judge Hilliard's own description of events, which were not tested or challenged through cross-examination, in its description of the relevant facts. *See* Dissent at 9090. Thus, the dissent adopts one disputed view of the facts at issue here and then claims they are undisputed.[4]

---

[4]The dissent also seems to suggest that a judicial bias claim based on appearance of bias could never present a factual question, and that Hurles has acknowledged as much. Dissent at 9096 n.15. However, that the test is appearance of bias rather than actual bias does not obviate the need for facts to support one's claim. Indeed, all judicial bias claims must proffer some set of facts that indicate an unconstitutional potential for bias. Hurles does so by laying out the facts which he contends indicate a potential for bias and unequivocally arguing that Judge Hilliard's opinion was based on an unreasonable determination of the facts.

Hurles has always contested Judge Hilliard's version of the facts and her determination that she was not involved with the special action proceeding.

**[10]** Moreover, Judge Hilliard herself presided over the collateral proceedings, evaluating Hurles's claims regarding her own alleged misconduct during trial and sentencing. While judges frequently consider contemporaneous motions for recusal based on their own alleged conflicts of interest, the Supreme Court has noted the inherently problematic nature of reviewing such inquiries. *See Caperton v. A.T. Massey Coal Co.*, 129 S. Ct. 2252, 2263 (2009) ("[Without objective rules,] there may be no adequate protection against a judge who simply misreads or misapprehends the real motives at work in deciding the case. The judge's own inquiry into actual bias, then, is not one that the law can easily superintend or review . . . ."). We note, however, that this case presents a particularly unusual and problematic scenario. Typically, judges' considerations of their conflicts of interest take place in the context of contemporaneous motions for recusal before the allegedly biased proceedings occurred. In that circumstance, the judge is merely asked to prevent a future harm from occurring, *see, e.g.*, *Tumey v. Ohio*, 273 U.S. 510, 515 (1927), and the judge is charged simply with determining whether failure to recuse *could* create a potential for bias. Here, by contrast, Judge Hilliard provided a post-hoc justification for her own conduct in response to allegations that she had already behaved improperly and violated Hurles's rights. This unusual posture distinguishes this case from the routine examples cited by the dissent, dissent at 9097-98, and raises concerns about a judge's ability to determine impartially whether she has, in essence, violated the law. *See Murchison*, 349 U.S. at 136 ("[N]o man can be a judge in his own case . . . .").

**[11]** Based on these flaws in the state court's fact-finding process, we find the state court decision resulted in an "unreasonable determination of the facts" and is not entitled to a presumption of correctness under AEDPA. *See Maddox*, 366

F.3d at 999 (explaining that application of the " 'unreasonable determination' clause" is appropriate to situations in which "the process employed by the state court is defective") (citations omitted). We therefore turn to consider Hurles's judicial bias claim.

## C    The Merits of the Judicial Bias Claim

In this case, at least three problems raise an unconstitutional potential for bias given Judge Hilliard's later role as the sole arbiter of Hurles's sentence: (1) her unnecessary and improper participation in the special action to defend her own ruling against the defendant[5]; (2) her troubling comments about the simplicity of his case and the overwhelming evidence of guilt that she made before a single witness had testified; and (3) her comments questioning the competence of Hurles's attorney. Taken together, these unique facts point to the overarching conclusion that Judge Hilliard held two incompatible roles: that of arbiter and that of adversary. Therefore, Judge Hilliard's recusal was required in order to protect Hurles's due process right to a fair trial.[6]

---

[5]The Arizona Court of Appeals found the judge's conduct to be improper and characterized this type of intervention in a special action proceeding as one indicating that the trial judge has abandoned her neutral role. *See Hurles v. Superior Court*, 849 P.2d 1, 3 (Ariz. Ct. App. 1993) (internal quotations omitted).

[6]The dissent emphasizes the fact that another trial court judge, Judge Ballinger, reviewed and denied Hurles's motion to recuse Judge Hilliard from presiding over his second petition for post-conviction review. Dissent at 9097-98 & n.16. First, under AEDPA, our review is focused on the last reasoned state court decision, which is Judge Hilliard's denial of Hurles's second state post-conviction petition. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Therefore, Judge Ballinger's decision is not the decision we are reviewing. Second, Judge Ballinger's four-sentence, unreasoned minute order does not purport to rule on the merits of Hurles's judicial bias claim (or any of his other claims for post-conviction relief); rather, it simply denies Hurles's motion for a change of judge for cause. It contains no analysis of the facts or applicable law at issue in the case, and makes no pronouncement as to the merits of any of Hurles's claims.

Respondent highlights the fact that Hurles did not raise his judicial bias claim sooner (either at trial or on direct appeal) and that the Arizona Court of Appeals did not seek Judge Hilliard's recusal in the aftermath of its decision denying her standing in the special action. We find these arguments unpersuasive for several reasons. First, to the extent that the respondent raises a procedural argument regarding the timing of Hurles's judicial bias claim, it is meritless. No party has directly argued that Hurles failed to exhaust or has otherwise waived or defaulted on his judicial bias claim. The Arizona Superior Court did not consider or find any procedural problems with Hurles's claim; rather, the court reached the merits of Mr. Hurles's claim and denied it on the merits. Indeed, the claim was exhausted through "one complete round of the State's established review process," the state court denied the claim on the merits, and it is now properly before us. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

In addition, whether Hurles would have been better served by seeking Judge Hilliard's recusal earlier, or whether the Arizona Court of Appeals should have sought her recusal, does not control our current evaluation of the claim. The burden is on the judge to disqualify herself, even if a party never seeks recusal. *See* 17A Ariz. Rev. Stat. Sup. Ct. Rules, Rule 81, Code of Jud. Conduct, Rule 2.11(A) ("A judge *shall disqualify himself or herself* in any proceeding in which the judge's impartiality might reasonably be questioned.") (emphasis added); *see also, e.g.*, 28 U.S.C. § 455(a) (same). Furthermore, Hurles has raised ineffective assistance of counsel claims with regard to both his trial and appellate counsel. We do not reach or decide these claims because the judicial

---

Finally, that one judge has ruled differently in a particular case is not by itself persuasive in a case where, as here, the specific ruling at issue (Judge Ballinger's order) is not entitled to any deference. Habeas review (and indeed, appellate review more generally) presupposes numerous earlier judgments against a petitioner. Our role is to determine whether those prior decisions should stand under governing law.

bias claim is dispositive, but we hesitate to lend persuasive weight to the fact that he did not raise his judicial bias claim while represented by those attorneys.

### 1. Judge Hilliard's Adversarial Role

Judge Hilliard injected herself into a special action proceeding in which Hurles appealed her denial of his request for additional counsel and argued that she had abused her discretion. As noted above, while special action proceedings in Arizona require the trial judge to be named as the nominal respondent, this is typically a mere formality and does not warrant any response or active participation by the judge. *Hurles*, 849 P.2d at 2. In this case, however, Judge Hilliard filed a responsive pleading through her counsel, the Arizona Attorney General's office, arguing the merits of her decision.

**[12]** The Arizona Court of Appeals issued a published opinion denying the judge's standing to appear in the special action and finding that her responsive pleading was improper. *Id.* at 4. Specifically, the court held that judges may not file responsive pleadings in special action proceedings solely to make "I-ruled-correctly" arguments. *Id.* Such conduct, the court found, transformed the judge's role from that of an impartial arbiter to that of an adversary. Specifically, the court characterized this kind of intervention as follows:

> [T]he trial judge, that impartial dispenser of justice . . . stands before the appellate tribunal to defend his ruling and his honor. The trial judge is no longer impartial. He is an adversary and an advocate.

*Id.* at 3 (quoting *State ex rel. Dean v. City Court*, 598 P.2d 1008, 1010 (Ariz. Ct. App. 1979)). The court thus ruled that her conduct was improper because it threatened a "principle . . . essential to impartial adjudication," that judges have "no personal stake—and surely no *justiciable* stake—in whether they are ultimately affirmed or reversed." *Id.* at 4 (emphasis

in original). Despite this ruling, Judge Hilliard continued to preside over Hurles's trial and unilaterally determined his death sentence after he was convicted.[7]

**[13]** Respondent argues that Judge Hilliard was a mere nominal party in the special action proceedings. However, the Arizona Court of Appeals's decision specifically drew a distinction between judges who behave as "nominal" parties and those who, despite the fact that no response or appearance is required, nonetheless appear and submit arguments on their own behalf. The court then determined that, within the category of the more active parties, some kinds of responses are proper (those based on administrative or policy-based arguments) and some are improper (those that defend the judge's decision against the petitioner's claim). *Id.* at 3. Thus, the Court of Appeals found that Judge Hilliard was neither a standard nominal party, nor an appropriate active party. Instead, it agreed with the *Dean* court's assessment that participation such as Judge Hilliard's in the special action transformed the trial judge into "an adversary and an advocate." *Id.* at 3.

The dissent argues that we overstate the Arizona Court of Appeals's characterization of Judge Hilliard's participation in the special action as "improper"; rather, according to the dissent, the court "merely resolved two competing lines of authority and determined that a trial judge lacks standing to defend a specific ruling in a special action proceeding." Dissent at 9089. This is a strained reading of the Court of Appeals's opinion. That its decision was an important and strong rebuke of active judicial participation in special actions is apparent from Judge Hilliard's statement in her later Minute Entry that "judges no longer file an 'improper' response in special actions since the court's decision in *Hurles v. Superior Court*." Minute Entry at 3. Indeed, even the Arizona

---

[7]Arizona's system of allowing judges to deliver death sentences without a jury has since been held unconstitutional. *Ring v. Arizona*, 536 U.S. 584, 596-97 (2002).

Attorney General's Office, which represented Judge Hilliard in the special action, conceded that the Court of Appeals's opinion was concerned with protecting the impartiality of judicial proceedings that was threatened by participation such as Judge Hilliard's. *See* Opp. to Mot. to Recuse at 2, Hurles v. Schriro, No. CIV-00-0118-PHX-RCB (D. Ariz. 2008), ECF 72-6 at 24 ("The [Arizona Court of Appeals] held that . . . it is improper for a judge to [act as Judge Hilliard did]. . . . The court reasoned that when a judge responded to a special action and claimed that he or she had ruled correctly, *it placed the judge at odds with the party who filed the special action, which might affect the perception of impartiality of the proceedings.*") (emphasis added) (internal citations omitted).

Respondent argues that regardless of how we classify Judge Hilliard's participation, we should not consider statements in the responsive pleading to be statements by the judge. However, while Judge Hilliard recalls that she was not involved, Colleen French, her counsel, conceded otherwise. In a brief filed with the district court in Hurles's federal habeas proceedings, Ms. French stated, "Undersigned Counsel's communications with the Trial Judge during the special action proceedings cannot be construed to have been ex parte because Undersigned Counsel represented the Trial Judge at the time they occurred." Response to Pet.'s Mot. to Disqualify at 6, *Hurles v. Schriro*, No. CIV-00-0118-PHX-RCB (D. Ariz. 2008), ECF 27. Thus, her level of personal involvement in the special action is, at best, contested.

**[14]** Even if we accept Judge Hilliard's averment that she had no direct involvement in the special action, however, we may still properly attribute statements in the brief to her for at least two reasons. First, the responsive pleading was in the judge's name, as stated in the introduction.[8] This statement is

---

[8] "Respondent Judge Hilliard, through her attorneys undersigned, hereby enters her response to Petitioner's petition for special action." Response to Pet. for Special Action, CV-93-0046-SA (Mar. 1, 1993).

no different from the language used by counsel for Hurles.[9] The presumption that statements in one's name are statements of that person is a logical one, and there is no reliable evidence in the record that demonstrates otherwise.[10] The Judge also received copies of the briefing and therefore had an opportunity to object to any statements made on her behalf, which the record indicates she did not do. It is unclear why statements of a client's attorney should not be imputed to the client in this instance, as they are in every other scenario. Whether Judge Hilliard herself actually wrote the language in her special action brief is irrelevant. She was the respondent and the brief was filed in her name; statements in the brief are therefore attributable to her. We need not inquire further into her subjective state of mind, especially given the Court of Appeals's treatment of the issue as a pleading filed by her. *Hurles*, 849 P.2d at 4 ("We come then to the question which sort of pleading *the responding judge has offered* in this case.") (emphasis added).

Second, petitions for review in the Arizona Supreme Court challenging the Court of Appeals's decision in the special action refer to the judge's responsive pleading with the presumption that they are her arguments, just as the statements of counsel are always the statements of the client. The presiding criminal judge of the Maricopa County Superior Court, Ronald S. Reinstein, petitioned for a special action to the Arizona Supreme Court following the Court of Appeals's ruling in *Hurles v. Superior Court* in order to defend the judges'

---

[9]"Petitioner, Richard Hurles, by and through his undersigned counsel, respectfully petitions the Court . . . ." Pet. for Special Action, CV-93-0046-SA (Feb. 18, 1993).

[10]The dissent attempts to distance Judge Hilliard from the special action proceeding by referring to the brief as simply "submitted in Judge Hilliard's name" and without her involvement. Dissent at 9096. This linguistic strategy merely highlights the key factual dispute in this case: whether and how much Judge Hilliard was involved in the special action. The dissent and Judge Hilliard resolve this dispute by pointing to Judge Hilliard's factual testimony submitted in her minute entry.

ability to appear in such proceedings. *See* Pet. for Special Action, CV-93-0135-SA (Apr. 20, 1993). In that petition, Judge Reinstein referred to the pleadings in the Hurles special action as "Judge Hilliard's response," *id.* at 6, and highlighted the direct participation of judges in defending their rulings or policies in special action proceedings. Judge Reinstein's petition makes no distinction between the judge and any other client, who may be represented by counsel but is nonetheless speaking directly through his or her legal pleadings. Judge Reinstein also argues that if judges are not able to appear in special actions like Hurles's—actions in which the state has no standing to appear—the proceeding would "completely lose[ ] its adversarial quality." *Id.* at 4. The Superior Court's presiding criminal judge thus assumed judges in this type of posture are indeed adversaries of the party bringing the appeal.

The Arizona Attorney General, Grant Woods, also petitioned the Arizona Supreme Court for a special action following the Court of Appeals's ruling, seeking to have the Court decide whether the Attorney General's Office could continue to represent judges in special action proceedings given the court's concern over potential conflicts of interest. Pet. for Special Action, CV-93-0134-SA, at 5-6 (Apr. 20, 1993). The petition argues that if the Attorney General cannot represent judges, they would have to appear themselves or hire private counsel. *Id.* This presumes a standard attorney-client relationship in which the primary actor is the client, Judge Hilliard, not the Attorney General, her counsel. Therefore, we conclude that statements in the brief are properly attributable to Judge Hilliard.

### 2. *Statements About the Case*

**[15]** In addition to the fact of Judge Hilliard's participation, the brief itself contains numerous troubling statements about the merits of Hurles's case. These statements display a familiarity with, and prejudgment of, the facts of his case long

before any evidence had actually been presented. Judge Hilliard's brief describes the nature of Hurles's case, concluding that it was "very simple and straightforward," with an overwhelming amount of evidence assembled to demonstrate his guilt for the "brutal murder." While any judge would need to make a determination as to whether additional counsel is needed by evaluating the relative complexity of a case, here it is the manner in which Judge Hilliard dismissed Hurles's case as "simple" that is problematic. Rather than discussing the simplicity of the case with reference to the number of expert or percipient witnesses that would need to be prepared, the number of trial days the case would likely call for, or other content-neutral factors, Judge Hilliard referred to the case as "simple" because the state had already purportedly amassed overwhelming evidence of guilt against the defendant. She writes:

> The State's evidence at this point includes, but is not limited to the following: eyewitness statements indicating that Petitioner was seen running from the Buckeye library after a witness saw a woman bleeding profusely inside the locked library building, Petitioner's statement to his brother that he had stabbed someone at the library, Petitioner's shirt and pants stained with blood of the same PGM type as the victim's, Petitioner's footprint in the victim's blood at the scene, and the fact that books returned by Petitioner in the return slot at the library place him at the scene a[t] the time of the murder.

This description leads to only one conclusion. According to Judge Hilliard, the case was simple because he was obviously guilty.

The dissent's contention that the proceeding "involved an evaluation of the evidence only for purposes of determining whether a second counsel was necessary" assumes the conclusion it wishes to draw. Dissent at 9092-93. Judge Hilliard's

analysis is quite different from, for example, a detached determination that the case was simple because it would require very little witness preparation. In fact, on such neutral measures, the case was not simple at all. Judge Hilliard acknowledged that the State had already listed "22 witnesses to be called at trial" and that the defense witness list was at that time unknown. While Judge Hilliard attempted to characterize the scientific evidence required as minimal, by her own admission there would be, at a minimum, blood, fingerprint, and footprint analysis. In addition, she focuses solely on guilt-phase evidence without mention of the sentencing process, one of Hurles's counsel's chief justifications for requesting additional counsel. As the subsequent competency evaluations and testimony at trial and sentencing showed, Hurles's personal and family background required extensive investigation into a multitude of alleged mitigating factors. Moreover, she gives short shrift to the need for extensive investigation on the part of Hurles's attorney to prepare a defense, including alleged bases for legal insanity. Indeed, the evidence amassed by the prosecution posed significant challenges for the defense. That the prosecution appeared to have a strong case for guilt does not render the defense's job easier or "simpler." To the contrary, the more evidence the prosecution has, the more challenging it would be for the defense to put on a good case. Therefore, Judge Hilliard could not have been referring to the case as "simple" in any technical sense. There is no plausible reading of Judge Hilliard's statements other than that the case's resolution was a foregone conclusion.

**[16]** Judges are free to form opinions based on evidence presented in the same or earlier cases involving the litigant in question without offending notions of due process. *See Crater v. Galaza*, 491 F.3d 1119, 1130-32 (9th Cir. 2007) (finding no due process violation where the judge's opinions as to the likelihood of a guilty verdict against defendant was based on evidence presented in an earlier, now complete, proceeding against his co-defendant for the same incident). In this case, however, the judge's opinions were formed long before trial

and before any evidence had been presented. Indeed, the brief presumes that the State's amassed evidence is virtually unassailable, for if there were flaws in the scientific evidence, then the time required to prepare a vigorous defense would be much more significant than Judge Hilliard suggests.[11] Judge Hilliard's statements thus indicate a prejudgment of the case against Hurles months before she would preside over his trial and, later, unilaterally sentence him to death and adjudicate his post-conviction claims for relief.

### 3.   Statements About Hurles's Counsel

**[17]** Finally, Judge Hilliard challenged the professionalism of Hurles's attorney, whose credibility would later be important as Hurles's sole counsel during the trial and sentencing proceedings. She argued that the attorney's insecurity over handling the case on her own placed her competence in doubt. Judge Hilliard stated:

> [I]f Appointed Counsel believes, because of her caseload, *personal competence*, or otherwise, that she is incapable of rendering "competent representation" of the Petitioner, she is ethically bound to withdraw from this case, and, quite possibly, to withdraw her name from the list of lawyers who contract to provide defense services on behalf of Maricopa County as well. *Clearly there are other attorneys who provide contract services for Maricopa County*

---

[11]Judge Hilliard's brief lacks any equivocation as to the strength of the State's purported evidence. For example, eyewitnesses do not "claim" or "allege" to have seen Hurles at the library, but rather they "indicate" that he was indeed at the library. Similarly, Hurles's "footprint [was] in the victim's blood," and evidence "place[s] him at the scene a[t] the time of the murder." This language leaves no doubt as to what the factual findings should be in Hurles's case, even though many months would pass before any evidence would actually be presented in court and be subject to cross-examination.

> *who would be able to provide competent representation in a case as simple as this.*

This point was entirely superfluous to the brief and appears designed merely to question the competence of an attorney who determined she needed assistance in a capital case. Indeed, in addition to questioning her competence in this particular case, the brief even raises the prospect that this attorney should no longer receive gainful employment from Maricopa County if she did not have the "personal competence" to do so. After having raised questions about Hurles's only legal counsel in pleadings to the Arizona Court of Appeals, Judge Hilliard then had sole responsibility for determining the credibility of mitigating evidence presented by that attorney. Taken together with her comments about the merits of Hurles's case, such direct pre-judgment raises an unconstitutional probability of bias.

\* \* \* \* \*

Based on these three deficiencies flowing from the special action proceeding, the "average" judge would be tempted "not to hold the balance nice, clear, and true." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). Judge Hilliard's conduct falls within the parameters of behavior prohibited by clearly established Supreme Court precedent. In *Murchison*, for example, the Court found an appearance of bias where the judge who had acted as a "one-man grand jury" later presided over the defendant's contempt trial relating to his conduct before the judge in that grand jury. *In re Murchison*, 349 U.S. 133, 137 (1955). The Court determined that "the judge had a conflict of interest at the trial stage because of his earlier participation followed by his decision to charge them." *Caperton v. A.T. Massey Coal Co.*, 129 S. Ct. 2252, 2261 (2009) (describing the holding of *Murchison*). Similarly, in *Johnson v. Mississippi*, the Court evaluated a judge's fitness to preside over the petitioner's criminal contempt proceeding. 403 U.S. 212, 215 (1971). The judge had previously been named as a defendant in a sep-

arate civil rights suit brought by the petitioner, and subsequently made "intemperate remarks" about civil rights litigants. *Id.* Based on the judge's status as an adversary in the petitioner's civil rights suit and his remarks about litigants such as the petitioner, the Court determined that he was too "enmeshed in matters involving [the] petitioner" to preside over his contempt proceeding. *Id.*

**[18]** As in *Murchison* and *Johnson*, here the judge's conflict of interest at the trial and sentencing stages arose from her "earlier participation" as a direct party in the special action proceeding. *Caperton*, 129 S. Ct. at 2261. The *Murchison* Court distinguished these circumstances from one in which a judge simply responded to conduct in open court. *Murchison*, 349 U.S. at 137. Similarly, Judge Hilliard's initial denial of the motion for additional counsel is not the basis for any claim of bias, nor was her status as a nominal respondent in the special action. Rather, it was her direct participation in the special action that made her "part of the accusatory process" and rendered her ineligible to preside over the remainder of Hurles's case. *Id.*

The dissent attempts to distinguish *Murchison* and *Johnson* because Judge Hilliard (a) was only a party in an ancillary proceeding, rather than in the trial itself, (b) did not assume a "prosecutorial role" in Hurles's case, and (c) did not appear to have "personal animus" towards Hurles. Dissent at 9092-93. This misconstrues the two cases. First, the sources of the bias at issue in both *Murchison* and *Johnson* were separate pretrial proceedings. *Id.*; *Johnson*, 403 U.S. at 215. Other courts have also construed Supreme Court case law to apply more broadly to the process as a whole. *See, e.g.*, *United States v. Meyer*, 462 F.2d 827, 842 (D.C. Cir. 1972) (describing necessity for recusal when the judge "has adopted an adversary posture with respect to the alleged contemnor, as in *Murchison* and *Johnson*").

Second, the fact that Hurles initiated the special action proceeding and Judge Hilliard did not have a direct prosecutorial

role is of no import. Indeed, we find no authority for the proposition that whether a judge affirmatively *creates* the conflict determines whether she can proceed impartially. *Johnson* itself involved a judge who had been named as a defendant in the petitioner's civil rights suit. *Johnson*, 403 U.S. at 215. *Murchison* likewise does not state that the judge must be the initiator or instigator of the accusatory process; it states instead that she must recuse herself if she becomes "part" of the accusatory process. A defendant such as Judge Hilliard is still part of the process to the extent that she was an adversary in the special action and then proceeded to preside over Hurles's trial and single-handedly determine his sentence. *See also Smith v. Lockhart*, 923 F.2d 1314, 1322 n.12 (8th Cir. 1991) (finding that judge should have disqualified himself because he had been "a defendant in Smith's federal class action suit"); *United States v. Meyer*, 462 F.2d 827, 842 (D.C. Cir. 1972) (emphasis added) ("Thus, the trial judge, by virtue of his status as a *defendant* in a suit brought by the alleged contemnor, was in an adversary posture with respect to him, and was presumptively biased. This is true even though the judge's status as an adversary party was created by an action of the alleged contemnor (filing suit) . . . ."). Whether Judge Hilliard was a plaintiff or defendant in the action at issue is thus irrelevant; what matters is her adversarial posture toward Hurles.

Finally, the Supreme Court has never required evidence of "personal animus" in order to demonstrate judicial bias. Though the *Johnson* Court made note of the judge's "intemperate remarks . . . concerning civil rights litigants," *Johnson*, 403 U.S. at 215, it grounded its holding in the fact that the judge had previously been an adversary in the petitioner's civil rights suit. This comports with the Court's longstanding rule, which the dissent recognizes, that a petitioner need not demonstrate actual bias in order to succeed on his claim. *See Caperton*, 129 S. Ct. at 2262-63. Moreover, as discussed above, Judge Hilliard also made inappropriate statements in her response brief, statements which suggested she had pre-

judged the strength of Hurles's case. That *Johnson* happened to involve more direct evidence of personal animus does not render it inapplicable here.

Respondent's position that Judge Hilliard "prevailed" in the special action, and therefore had no incentive to be biased against Hurles, is both misleading and logically unsound. While the Court of Appeals declined to exercise jurisdiction over the petition for special action, it sided with Hurles in holding that Judge Hilliard had no standing to appear as more than a nominal respondent in the case, or in any case with the posture of *Hurles v. Superior Court*. In fact, the court issued an opinion solely to point out the impropriety of the judge's actions and to set a precedent against any future involvement of that kind by a judge in a special action proceeding. *Hurles*, 849 P.2d at 1 ("This petition for special action presents a significant threshold question of standing, which we publish this order to address."). Thus, on the subject of the opinion, Judge Hilliard did not prevail at all; rather, she was called out for "inappropriate" conduct. *Id.* at 4. Moreover, depending on the circumstances of the proceeding, whether the Judge had "prevailed" would not necessarily alter her temptation toward bias against the defendant. In this case, given the concern expressed by the Court of Appeals, Judge Hilliard had reason to be biased against Hurles independent of the fact that the court did not reach the merits of her order denying additional counsel.

**[19]** We emphasize again that it is the highly unusual facts of this case that compel us to conclude Hurles was denied his right to due process. As the Supreme Court has noted, "most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (citations omitted). We deal here with a perfect storm of rare incidents that are unlikely to repeat themselves. Unlike in *Caperton*, where the Court had to con-

tend with the possibility that its ruling would unleash a "flood of recusal motions," this case presents no such danger. *Caperton*, 129 S. Ct. at 2265; *see id.* at 2274 (Scalia, J., dissenting) (arguing that the Court's decision would lead to a drastic increase in judicial bias litigation). First, as Judge Hilliard herself pointed out, special action appearances by trial judges no longer occur in the wake of *Hurles v. Superior Court*. Thus, this factual scenario is a relic of past practice in Arizona courts, rare even at the time and nonexistent today. Second, in this particular case, the judge in question was the sole arbiter of the defendant's death sentence; she alone weighed the evidence and determined that Hurles deserved to die. This practice is no longer constitutionally permissible in the wake of *Ring v. Arizona*, 536 U.S. 584, 597-98 (2002). Indications of probable bias are thus all the more troubling in an exceptional case such as this, and the consequences of an unfair capital sentencing are irreversible. We must therefore conclude that "[o]n these extreme facts the probability of actual bias rises to an unconstitutional level." *Caperton*, 129 S. Ct. at 2265.

## IV.  CONCLUSION

At oral argument, when counsel was asked what relief she was seeking for her client pursuant to his judicial bias claim, she requested only a new sentencing. Therefore, we remand to the district court with instructions to grant a writ of habeas corpus as to Petitioner's sentence unless the State of Arizona elects, within 90 days of the issuance of the mandate, to resentence Petitioner before a jury and presided over by a judge other than Judge Hilliard, within a reasonable time thereafter to be determined by the district court.

Because Hurles will receive a new sentencing and, if necessary, a new appeal after his sentence has been determined by a jury, we do not reach or decide the remainder of his claims on appeal, including whether his sentencing or appellate counsel were ineffective, and whether he defaulted on any of those claims.

**REVERSED and REMANDED.**

IKUTA Circuit Judge, dissenting:

Today the majority overturns a convicted murderer's capital sentence, ignoring AEDPA's command to defer to a state court's decision unless it is objectively unreasonable. *See Williams v. Taylor*, 529 U.S. 362, 407 (2000). The AEDPA analysis here is straightforward. During the preliminary phases of Hurles's capital trial, the state trial judge denied Hurles's motion for appointment of a second attorney. Hurles appealed that denial in a special action proceeding, and the state Attorney General submitted a brief in the trial judge's name defending the ruling. Over seven years later, after an unsuccessful direct appeal and post-conviction proceeding, Hurles claimed that the trial judge's participation in the special action proceeding violated his due process rights and moved for her recusal from further participation in his case. The trial judge denied Hurles's motion and rejected his claim that her participation in the special action proceeding created an unconstitutional "appearance of bias." Hurles now claims that this conclusion is contrary to Supreme Court precedent. Because there is no clearly established Supreme Court authority that even hints the trial court's decision was wrong, we must defer to its determination and deny the petition. *Murdoch v. Castro*, 609 F.3d 983, 991 (9th Cir. 2010) (en banc).

The majority's contrary conclusion that it can avoid AEDPA deference and grant the petition under § 2254(d)(2)[1] is unsupportable. The state court decision at issue is not "based on an unreasonable determination of the facts,"

---

[1]Section 2254(d)(2) states:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim— . . . (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

because it is a legal determination as to whether the undisputed facts give rise to an appearance of bias. Neither Hurles nor the majority has suggested how the state court's legal conclusion on this issue was based on objectively unreasonable fact-finding. Because there is no basis for avoiding AEDPA deference here, we are not authorized to grant habeas relief. § 2254(d). I respectfully dissent.

I

Because an objective view of the facts and procedural history of Hurles's case is crucial to a correct understanding of the legal issues in dispute, I briefly recount the relevant sequence of events.

A

The facts of Hurles's crime form the backdrop for the dispute over whether Hurles needed a second attorney, which is at the heart of his habeas claim. The Arizona Supreme Court provided the following description:

> On the afternoon of November 12, 1992, Hurles went to the Buckeye public library, a small, house-type building in a residential neighborhood. The only employee in the library at the time was Kay Blanton. The last patron, other than Hurles, left the library just before 2:40 p.m. Hurles then locked the front doors to the library and attacked Blanton in the back room. He stripped off her underwear and pulled her skirt above her waist in an unsuccessful attempt to rape her. Using a paring knife found in the back room of the library, Hurles mortally wounded Blanton, stabbing her thirty-seven times and inflicting blunt force trauma by kicking her to such an extent he tore her liver. [Hurles then fled the scene.]
>
> . . . .

Between 3:00 and 4:00 p.m., Hurles rode [a borrowed] bicycle to the home of his nephew, Thomas, in Buckeye and asked Thomas for a ride to Phoenix. Hurles had changed his clothes and cleaned himself up somewhat, and Thomas, who had been asleep and was unaware of Blanton's murder, agreed to drive Hurles to Phoenix. As the two left the house, Hurles was carrying a bundle of clothes. During the drive to Phoenix, Thomas noticed that Hurles had bite marks on his wrist. When asked about them, Hurles told Thomas he had been in a fight with a Spanish man at the library, that he had stabbed the man with the man's knife, and that he had received the bite marks in the fight. As part of his insanity defense, however, Hurles later claimed he had no recollection of anything that occurred between sitting in the library and going out the back door.

As they continued toward Phoenix, Hurles had Thomas pull over so he could toss the bundle of clothes out the car window. Thomas left Hurles at a Phoenix bus station, where he purchased a bus ticket to Las Vegas. Thomas returned to Buckeye, where he ultimately made contact with the police and told them of Hurles' destination. Later that evening, the police intercepted Hurles' bus on the way to Las Vegas; Hurles was removed from the bus, arrested, and returned to Phoenix.

With Thomas' help, the police recovered Hurles' discarded clothes. Police found blood on the clothing that matched Blanton's blood type, which occurs in one percent of the population. Police also found blood matching Blanton's type on Hurles' shoes, which he was still wearing when taken from the bus. Four bloody shoeprints at the murder scene matched the soles of Hurles' shoes, and Hurles' palm print was found on the paring knife left at the scene.

. . . .

   . . . Blanton would have suffered great terror as she was stabbed repeatedly by Hurles. She also must have suffered great pain. In addition to the fifteen defensive stab wounds on her hands, Blanton was stabbed eight times in the head, twelve times in the torso, and twice in her lower extremities. She also suffered blunt trauma consistent with kicking, which tore her liver.

   The barrage of violence inflicted on Blanton, the fact that she was conscious throughout the attack, and her struggle to fight off her attacker all indicate she suffered terribly and far above the norm of even first-degree murder, leaving no room to doubt that this murder was especially cruel.

*State v. Hurles* (*Hurles II*), 914 P.2d 1291, 1293-94, 1299 (Ariz. 1996).

B

   After Hurles was indicted for this murder, Maricopa County appointed private defense counsel to represent him. Hurles made an ex parte motion for the appointment of a second counsel to aid in his defense. He argued that he was entitled to a second attorney because: (1) the case would "involve numerous civilian and law enforcement witnesses"; (2) the state would have forensic experts testify regarding suspect identification and sexual assault; and (3) "[p]reparation for the possible penalty phase in such a case will [be] in itself a time consuming, complex process." To support his arguments on the third point, Hurles cited to California, rather than Arizona, law. As later noted by the Arizona Court of Appeals, Hurles's motion for a second attorney was bare-bones, and failed to make "a particularized showing on the need for second counsel." *Hurles v. Superior Court*, 849 P.2d 1, 4 (Ariz. Ct. App.

1993). It made no mention of possible defenses, did not discuss the size of the defense's witness pool for either the guilt or penalty phase, and did not specify any additional forensic or other technical information the defense would present on its own account. In short, it provided no substantial factual basis upon which the trial court could have concluded that a second attorney was necessary for Hurles to obtain adequate representation.

After the state trial court denied the request, Hurles filed a petition for special action in the Arizona Court of Appeals,[2] raising the same arguments he had presented in his motion. Per Arizona's rules for special actions, Hurles named the State of Arizona, represented by the office of the Maricopa County Attorney, as real party in interest, and the trial judge, Judge Hilliard, as a nominal respondent. *Id.* at 2. In response, the Arizona Attorney General filed a brief in Judge Hilliard's name, even though, as the Arizona Court of Appeals noted, it was not clear from the record that Judge Hilliard had even authorized a pleading to be filed in her name, nor that "there was [any] contact between Judge Hilliard and the Attorney General's office as the pleading was prepared."[3] *Id.*

The majority bases its claim that Judge Hilliard was biased primarily (if not solely) on the contents of this brief. First, the

---

[2]Under Arizona law, the denial of a motion for appointment of a second attorney is not immediately appealable, and so a petitioner seeks review of such a ruling by filing a petition for special action in the Arizona Court of Appeals. *See Hurles I*, 849 P.2d at 1 n.1, 2.

[3]The Attorney General explained that the presiding judge of the Maricopa County Superior Court requested a responsive pleading in this case. *Hurles I*, 849 P.2d at 4. Then-current Arizona precedent held that a judge had the right to appear in a special action, even though the judge was merely a nominal party. *Fenton v. Howard*, 575 P.2d 318, 320 (Ariz. 1978). Because the County is the prosecutor, it could not take a position on the selection of defendant's counsel in the special action proceeding, which led the state Attorney General to step in to respond on the trial judge's behalf. *Hurles I*, 849 P.2d at 1.

majority contends that the brief demonstrates Judge Hilliard's view that "the case was simple because [Hurles] was obviously guilty." Maj. op. at 9072. The majority's claim is belied by an objective reading of the brief. As explained above, Hurles's motion for appointment of a second counsel put at issue the question whether the case was too complex to be handled by one attorney. In ruling on the motion, the trial court had been obliged to consider the extent and complexity of the evidence likely to be presented in order to rule on the motion. The brief explained the basis for the trial court's decision. In response to Hurles's claim that a second counsel was required due to the high number of witnesses and forensic experts, the brief noted that Maricopa County planned to call "relatively few" witnesses, namely 10 law enforcement agents, the medical examiner, and several civilians.[4] The State also intended to present the following physical evidence: Hurles's clothing, which was "stained with blood of the same PGM type as the victim's," his footprint in the victim's blood at the library, and the "fact that books returned by [Hurles] in the return slot at the library place him at the scene a[t] the time of the murder."

Turning to Hurles's legal argument, the brief asserted that Hurles's reliance on California precedent was misplaced because Arizona had adopted different rules, procedures, and time frames. Specifically, according to the brief, while California law presumed the necessity of a second attorney in capital cases, Arizona had no such presumption. Further, in refuting Hurles's claim that the need to prepare simultaneously for the guilt and penalty phases mandated the appointment of a second attorney, the brief noted that while California required sentencing to begin within 20 days of the verdict, Arizona gave a capital defendant 90 days after the verdict to prepare for sentencing, as well as the option to seek

---

[4]For example, the State intended to present an eyewitness's statement that Hurles ran from the Buckeye library after a witness discovered Blanton bleeding on the library floor, as well as Hurles's statement to his brother than he had stabbed someone at the library.

an extension of that time for good cause; these procedural dif-
ferences made concurrent preparation for both phases far less
urgent in Arizona than in its sister state. Ariz. R. Crim. P.
26.3. Thus, the majority's contention that the brief gave "short
shrift" to Hurles's arguments, or ignored the sentencing phase
and the special burdens of a capital case, Maj. op. at 9072-73,
is wrong.

Finally, the brief opined that defense counsel's unsupported
request for co-counsel at such an early stage of a case involv-
ing a fairly standard workload and flexible system of dead-
lines amounted to speculation by Hurles's appointed counsel
that she would render ineffective assistance if she did not
have co-counsel.[5]

The majority also faults the brief for failing to consider "the
need for extensive investigation" to address the "alleged bases
for legal insanity." Maj. op. at 9073. But at the time of the
special action, Hurles's attorney had not yet noticed any
defenses (insanity or otherwise), and Hurles did not argue that
the work involved to prepare an insanity defense was a reason
he needed a second lawyer.

C

Before addressing the merits of the special action petition,
the Arizona Court of Appeals determined that the case raised
"a significant threshold question of standing" that gave the
court the chance to refine its jurisprudence on "whether—or
under what circumstances—the trial court may properly
respond" to a petition for special action. *Hurles I*, 849 P.2d at
1-2. The court acknowledged that in the seminal case, *Fenton
v. Howard*, the Arizona Supreme Court had held that "a judge

---

[5]The majority makes much of this statement, Maj. op. at 9074, but it
merely underscores the brief's argument that the state's case was simple
and straightforward, making appointment of a second attorney unneces-
sary.

does have the right to appear and to be represented in a special action against him, where the judge is a named respondent," 575 P.2d 318, 320 (Ariz. 1978), and that a later appellate decision, *State ex rel. Dean v. City Court of Tucson*, 598 P.2d 1008, 1009 (Ariz. Ct. App. 1979), had interpreted *Fenton* as establishing "a trial judge's unequivocal right to respond to a special action, whatever the nature of the decision the judge seeks to defend." *Hurles I*, 849 P.2d at 3.[6] Notwithstanding this precedent, the court of appeals concluded that a later decision, *Dunn v. Superior Court*, 722 P.2d 1164 (Ariz. Ct. App. 1989), which had interpreted *Fenton* as allowing a judge to respond to a special action to defend judicial policy, should govern such cases in the future. *Hurles I*, 849 P.2d at 3. Building on *Dunn*, the Arizona Court of Appeals held that a judge designated as the nominal respondent in a special action proceeding may file a brief for the purpose of defending an administrative policy or practice, but "that it is improper for a judge to respond merely to advocate the correctness of an individual ruling in a single case." *Id.* Applying its new standing rule to the case before it, the court noted that because "the pleading merely argues that the respondent judge ruled properly on the evidence before her . . . the trial judge lacked standing" to file a brief in the special action. *Id.* at 4.

Turning its attention to the merits of the special action petition, the Arizona Court of Appeals agreed with Judge Hilliard's denial of Hurles's motion to appoint a second counsel. Because Hurles's counsel had failed to make "a particularized showing" on the need for a second lawyer and did not "submit evidence to the trial court regarding customary practice in

---

[6]The Arizona Court of Appeals noted that *Dean* had criticized this result, and quoted *Dean*'s statement that its ruling allowed the trial judge to defend "his ruling and his honor," such that the trial judge "is no longer impartial." *Hurles I*, 849 P.2d at 3 (quoting 598 P.2d at 1010). The majority relies on this critique, Maj. op. at 9067, but fails to note that *Dean* nevertheless "interpreted *Fenton* as categorically permitting a special action response by any nominal-respondent judge." 849 P.2d at 3.

defense of capital cases," the court "[found] no matter that warrants special action intervention at this time." *Id.*

The majority's claims that the opinion by the Arizona Court of Appeals in this case "called out" Judge Hilliard "for 'inappropriate' conduct," Maj. op. at 9078, and constituted "an important and strong rebuke of active judicial participation in special actions," *id.* at 9068, are contrary to and unsupported by the language of that opinion.[7] While the majority uses the word "improper" nearly ten times to describe the fact that a brief was submitted on Judge Hilliard's behalf, *see* Maj. op. at 9051, 9056, 9060, 9065 n.5, 9067(twice), 9068, 9069, the Arizona Court of Appeals used the word "improper" only twice, to define when it is appropriate for a trial judge to submit a brief in a special action proceeding (in which case the

---

[7]Lacking support in the text of the Court of Appeals's opinion, the majority relies on two statements to buttress its position, one by Judge Hilliard, and the other by Assistant Attorney General Colleen French. In her order rejecting Hurles's judicial bias claim, Judge Hilliard noted that "judges no longer file an 'improper' response in special actions since the [Court of Appeals's] decision in *Hurles v. Superior Court.*" The majority's suggestion that this passage shows Judge Hilliard's acknowledgment that the court's "decision was an important and strong rebuke of active judicial participation in special actions," Maj. op. at 9068, is mystifying. If anything, the judge's use of quotation marks in this context connotes that "improper" was being used as a term of art, following the usage of the Court of Appeals, rather than its common meaning. The passage cannot fairly be read as a *mea culpa* on the part of the trial judge.

Second, the majority quotes the Assistant Arizona Attorney General as saying: " 'The [Arizona Court of Appeals] held that . . . it is improper for a judge to [*act as Judge Hilliard did*],' " Maj. op. at 9069 (emphasis added). The unabridged version of this quotation makes clear that the Court of Appeals was not specifically criticizing Judge Hilliard, but was formulating a new rule of law. The full quotation reads: "The court held that a judge named as a respondent in a special action can file a responsive pleading only to explain or defend an administrative practice, policy, or local rule, and that it is improper for a judge to respond 'merely to advocate the correctness of an individual ruling in a single case.' " Opp. to Mot. to Recuse at 2, *Hurles v. Schriro*, No. CIV-00-0118-PHX-RCB (D. Ariz. 2008), ECF 72-6 at *25. The majority's paraphrase is misleading.

judge has standing) and when it is inappropriate (such that the judge lacks standing).[8] *Hurles I*, 849 P.2d at 3-4. The court did not use the term "improper" to suggest that a judge who submits a brief in defense of a particular ruling gives the appearance of bias or otherwise commits any type of ethical impropriety.[9] Rather, the court of appeals merely resolved two competing lines of authority and determined that a trial judge lacks standing to defend a specific ruling in a special action proceeding.

Finally, it is noteworthy that at the time of the submission of the brief on behalf of Judge Hilliard, Hurles did not indicate any concern or otherwise flag this event as being out of the ordinary. Hurles said nothing about a judicial bias concern before or after the trial in which the jurors unanimously found him guilty of premeditated and felony murder. Nor did he raise such a concern at sentencing, where under then-current Arizona rules, the trial judge acted alone in imposing the death penalty. Nor did Hurles's direct appeal or first petition for post-conviction relief raise a judicial bias claim.[10] This silence detracts from Hurles's (and the majority's) position that the submission of the brief creates the sort of extraordinary situation that gives rise to a "probability of actual bias"

---

[8]The court explained its new rule on standing as follows: "We hold that it is proper for a judge named as a respondent in a special action to file a responsive pleading if the purpose of the response is to explain or defend an administrative practice, policy, or local rule, but that it is improper for a judge to respond merely to advocate the correctness of an individual ruling in a single case." *See Hurles I*, 849 P.2d at 3; *see also id.* at 4 ("Our holding that the judge's responsive pleading was improper makes it unnecessary for us to decide the propriety of the Attorney General appearing on her behalf.").

[9]By contrast, the Arizona Court of Appeals noted that it might be proper for a judge "attempting to respond to an allegation of ethical impropriety" to respond in a special action proceeding. 849 P.2d at 3 n.4. The court did not suggest that Judge Hilliard was guilty of an ethical lapse.

[10]Per Arizona Rule of Criminal Procedure 32.4(e), Hurles's first petition for post-conviction relief was assigned to Judge Hilliard. The trial court denied the petition, and the Arizona Supreme Court affirmed.

that is "too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *see* Maj. op. at 9067-78.

D

A year after the court denied his first petition for post-conviction relief, Hurles filed a motion stating that he intended to file a second petition for post-conviction relief that would raise his appearance-of-bias due process claim based on the special action proceeding. He therefore moved to recuse Judge Hilliard from further involvement in his case. Hurles's recusal motion was referred to a different trial court judge, Judge Ballinger, who ruled that there was no basis to transfer Hurles's case to another judge.[11] Hurles then submitted his second petition for post-conviction relief, which was assigned to Judge Hilliard pursuant to Arizona Rule of Criminal Procedure 32.4(e) and Judge Ballinger's determination. Judge Hilliard noted the applicable objective test under Arizona law for recusal, specifically, "whether a reasonable and objective person knowing all the facts would harbor doubts concerning the judge's impartiality." In describing the facts of the special action, Judge Hilliard stated that the Attorney General had no specific authorization to file a pleading on her behalf in the special action, and that she (Judge Hilliard) had made no contact with the Attorney General. She further noted that Hurles had not pointed to any aspects of the trial or the first petition for post-conviction relief that indicated bias. Relying on Judge Ballinger's determination, and applying Arizona's objective test, Judge Hilliard ruled that the facts did not require her recusal as a matter of state law, and did not amount to a due process violation. Therefore, the court rejected Hurles's claim. The Arizona Supreme Court affirmed without opinion.

---

[11]Judge Ballinger construed Hurles's motion as a motion for change of judge for cause, which under Arizona Rule of Criminal Procedure 10.1, entitles a defendant "to a change of judge if a fair and impartial hearing or trial cannot be had by reason of the interest or prejudice of the assigned judge."

## II

As described above, the state trial court determined that because a reasonable and objective person knowing all the facts would not harbor doubts about the judge's impartiality, Judge Hilliard's role in presiding over the trial and sentence did not deprive Hurles of his federal due process rights. The trial court's decision is the last reasoned decision on this claim, and therefore the one that we must consider under AEDPA review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991). Under § 2254(d)(1) and Supreme Court precedent, we are tasked with determining whether this determination was "contrary to" clearly established Supreme Court precedent, using the analytic framework set forth below.[12]

"Supreme Court precedent reveals only three circumstances in which an appearance of bias—as opposed to evidence of actual bias—necessitates recusal." *Crater v. Galaza*, 491 F.3d 1119, 1131 (9th Cir. 2007). These three situations are (1) when a judge "has a direct, personal, substantial pecuniary interest in reaching a conclusion against [one of the litigants]," *id.* (alteration in original) (quoting *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)) (internal quotation marks omitted); (2) when "a judge becomes embroiled in a running, bitter controversy with one of the litigants," *id.* (quoting *Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1971)) (internal quotation marks omitted); and (3) when a judge "acts as 'part of the accusatory process,' " *id.* (quoting *In re Murchison*, 349 U.S. 133, 137 (1955)). Here there is no claim that Judge Hilliard had a pecuniary interest in the prosecution of Hurles. Nor does the majority suggest that Judge Hilliard was embroiled in a running feud with Hurles. Instead, the majority relies on three Supreme Court opinions, *Murchison*, *Johnson*, and *Caper-*

---

[12]Because the state court did not expressly apply the Supreme Court's decisions considering when a probability of judicial bias rises to a constitutional level, only the "contrary to" prong of § 2254(d)(1) is at issue here. *See Williams v. Taylor*, 529 U.S. 362, 407 (2000).

*ton*,[13] as authority for its conclusion that Hurles's due process rights were violated because the judge acted as part of the accusatory process. Maj. op. at 9056-59, 9074-79.

This contention does not survive scrutiny. A state court decision is "contrary to" clearly established Supreme Court precedent only if "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases or if the state court confronts a set of facts materially indistinguishable from those at issue in a decision of the Supreme Court and nevertheless arrives at a result different from the Court's precedent." *Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004) (citing *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). For AEDPA purposes, a point of law is not "clearly established" if a state court can draw a "principled distinction" between the case before it and the Supreme Court precedent establishing that rule of law. *Murdoch*, 609 F.3d at 991.

Here, not only could a state court draw a principled distinction between the situation in this case and those in *Murchison* and *Johnson*, but it is quite a stretch to hold that such Supreme Court precedents apply at all. *Murchison* involved the appearance of bias of a Michigan state judge who, while sitting as a "one-man grand jury," concluded a witness was lying, charged him with perjury, and ordered him to show cause why he should not be convicted of criminal contempt.

---

[13]Because *Caperton* was decided in 2009, and the state court decision at issue was decided in 2002, *Caperton* is not "clearly established Supreme Court precedent" for purposes of AEDPA review. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000) (stating that § 2254(d)(1) requires the state court's decision to be measured against the "holdings . . . of [the Supreme Court's] decisions as of the time of the relevant state-court decision"). The majority justifies its reliance on *Caperton* by asserting it "announce[s] no new rule of law that would affect our analysis here," Maj. op. at 9057 n.3, yet its ten citations to that decision belie this claim and suggest its centrality to the majority's reasoning. But because the state court's decision was not contrary to *Caperton*, the majority's mistaken reliance on this decision does not help its AEDPA analysis.

349 U.S. at 134. The Court held that a judge could not act as a grand jury "and then try the very persons accused as a result of his investigations." *Id.* at 137. Unlike *Murchison*, Judge Hilliard did not assume a prosecutorial role in Hurles's case. In fact, neither Hurles nor the majority even suggests that Judge Hilliard participated in any way in the formal accusatory process that resulted in Hurles's trial, over which Judge Hilliard later presided. Nor can the special action proceeding, in which Hurles asked the Arizona Court of Appeals to grant his request for a second defense attorney, be deemed part of the "accusatory process." This proceeding, which was ancillary to any determination of guilt or penalty, involved an evaluation of the evidence only for purposes of determining whether a second counsel was necessary.

Similarly, *Johnson v. Mississippi*, 403 U.S. 212 (1971) (per curiam), involved a civil rights activist who successfully sued a state trial judge to enjoin the judge from discriminatory practices in seating juries. *Id.* at 214-15. Two days after being so enjoined, the trial judge found the defendant guilty of criminal contempt in a different case. *Id.* at 215. The Court concluded that due process would not permit the judge, who had just lost a civil rights case to the defendant (and therefore was subject to an ongoing federal injunction), to preside over the defendant's contempt trial. *Id.* at 215-16 (holding that because the judge had been "a defendant in one of petitioner's civil rights suits and a losing party at that," he was plainly "so enmeshed in matters involving petitioner" as to require his recusal). Unlike *Johnson*, the record here does not show that Judge Hilliard was "enmeshed" in matters involving Hurles, nor that someone in her position would likely have a personal animus toward him. *Cf. id.* at 215 (noting "the affidavits filed by the lawyers reciting intemperate remarks of Judge Perry concerning civil rights litigants"). The majority's position that the Arizona Court of Appeals's ruling on standing would give rise to a temptation on Judge Hilliard's part "not to hold the balance nice, clear, and true," Maj. op. at 9075 (quoting *Tumey*, 273 U.S. at 532), is meritless. With all due respect,

the majority's holding equating a state court ruling that Judge Hilliard lacked standing, but had ruled correctly on the merits of the appointment-of-counsel request, with *Johnson*'s order enjoining a judge from further racial and gender discrimination in his courtroom, fails even the straight-face test.

The majority also cites *Caperton* for the general proposition that a judge's failure to recuse may constitute a due process violation if "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." 129 S. Ct. at 2259 (quoting *Withrow*, 421 U.S. at 47). Although *Caperton* is not applicable here, because it was not clearly established Supreme Court precedent at the time of the state court decision at issue, the state court's decision is not contrary to this rule. The Court has made clear that the more general the rule laid out by Supreme Court precedent, the more latitude we must give a state court "to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009). *Caperton* makes clear that a failure to recuse rises to a constitutional violation only in the most "exceptional case." *Caperton*, 129 S. Ct. at 2263; *see also id.* ("It is, of course, not every attack on a judge that disqualifies him from sitting.") *(quoting Mayberry*, 400 U.S. at 465). Because the Arizona court's determination that the special action proceeding did not rise to such an exceptional level was not " 'diametrically different' [from], 'opposite in character or nature' [to], or 'mutually opposed' to" the rule of *Caperton*, it is not "contrary to" that case, and therefore does not violate § 2254(d)(1). *Williams*, 529 U.S. at 406.

Accordingly, an objective comparison of Hurles's case to the Supreme Court decisions discussed above shows beyond question that the state court's conclusion was not "contrary to" clearly established precedent. Because the court is not

relieved of AEDPA deference, the district court was correct in determining it had no authority to grant habeas relief.[14]

### III

Because the correct application of AEDPA here is straightforward, the majority's anomalous approach to AEDPA is surprising. Instead of considering whether the state court opinion was contrary to clearly established Supreme Court precedent, the majority focuses on whether the opinion was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Maj. op. at 9056 (quoting § 2254(d)(2)).

### A

The crucial flaw in this approach is clear: there are no material facts in dispute in this case. The ultimate question, whether a specific fact situation involving a judge "created a constitutionally intolerable probability of actual bias," is a legal question determined by objective rules. *See Caperton.* 129 S. Ct. at 2262; *see also id.* at 2263 (stating that the Due Process Clause "is implemented by objective standards that do not require proof of actual bias"). Consistent with this Supreme Court jurisprudence, Hurles focuses solely on apparent bias because, as he explains, "in the context of judicial conflicts of interest, due process is offended not by proof of

---

[14]Contrary to the requirements of AEDPA, the majority appears to conduct a de novo review of the state trial court's decision *sub silentio*. Maj. op. at 9059-65. But even were we authorized to engage in such review, there is no support for the majority's conclusion that Hurles's due process rights were violated. The Supreme Court has held that a judge's failure to recuse raises due process concerns only in "the most extreme of cases." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986). Even the majority's emotional description of the special action proceeding cannot disguise the fact that the Attorney General's submission of a brief supporting Judge Hilliard's denial of Hurles's motion for the appointment of a second counsel does not rise to that level.

actual bias (something literally impossible for a party to prove) but rather by the *appearance* of impropriety."[15] Given the "difficulties of inquiring into actual bias," the Supreme Court has noted that the judge's inquiry into his or her own motives or bias are irrelevant. *Id.* at 2263. For this reason, Judge Hilliard's explanations of her limited role in the proceeding, which the majority asserts are unreasonable, Maj. op. at 9064, do not make a difference to the state court's resolution of the constitutional issue. In her ruling, Judge Hilliard explained that the special action brief was drafted without her input or authorization and that she did not make contact with the Attorney General during the pendency of the special action. These are the only "facts" Judge Hilliard "found" based on her own knowledge. Maj. op. at 9060-61, 9062. But Judge Hilliard's views regarding her lack of involvement in the matter are not relevant to Hurles's claim that the undisputed facts (namely, that a brief was submitted in Judge Hilliard's name in the special action proceeding, the brief discussed the evidence the State intended to present, and the brief questioned whether Hurles's then-current attorney was able to render competent, effective assistance) gave rise to an appearance of bias. Said otherwise, Judge Hilliard's behind-the-scenes involvement in brief-writing, whether nonexistent, minimal, or substantial, is irrelevant to Hurles's claim that the publicly known facts give rise to a constitutionally intolerable appearance of bias.

---

[15]Hurles has consistently stressed the themes of "appearance of impropriety," and "structural due process," rather than any conduct evincing actual bias on the part of Judge Hilliard. For example, in his Second Petition for Post-Conviction Relief, Hurles repeatedly emphasizes that due process sometimes requires recusal of judges who have "no actual bias." Hurles also reminded the court that he "need not necessarily demonstrate actual subjective bias to prevail on [ ]his claim." Hurles's reply brief in the second post-conviction proceeding likewise argued that: "[C]ourts will find a due process violation upon a showing of a judge's conflict of interest—regardless of whether the complaining litigant can demonstrate any actual subjective bias at all." Hurles's own arguments thus undercut the majority's claim that the key inquiry in this case is a factual one.

B

The majority tries to escape the force of this conclusion by asserting that the state court's decision was based on an unreasonable fact-finding process. First, the majority claims that Judge Hilliard erred in resolving the challenge to her own impartiality. But as the majority acknowledges, Maj. op. at 9064, it is not improper for a judge to rule on his or her own recusal; rather, it is the standard procedure. Under both federal and Arizona law, judges typically rule on motions seeking to recuse them from a pending matter, and, where necessary, they determine the relevant facts. *Id.*; *see, e.g.*, 28 U.S.C. § 455(a); Ariz. Code of Jud. Conduct R. 2.11(A); *see also Microsoft Corp. v. United States*, 530 U.S. 1301, 1301-02 (2000) (statement of Rehnquist, C.J.) (setting forth the facts regarding his son's representation of Microsoft in a different matter, and concluding that those facts did not require his recusal in a case brought by Microsoft on the same subject matter because "a well-informed individual would [not] conclude that an appearance of impropriety exists" based on those facts); *Perry v. Schwarzenegger*, No. 10-16696 (9th Cir. Jan. 4, 2011) (statement of Reinhardt, J.) (setting forth the facts regarding his relationship with his wife and her involvement in the matter before him and rejecting a motion to recuse because "a reasonable person with knowledge of all the facts would [not] conclude that [his] impartiality might reasonably be questioned"). The majority asserts that a judge's determination about the propriety of recusal in a pending case is different from the same determination regarding a past case, Maj. op. at 9063-64, but no principled distinction can be made. In both situations, the judge must apply the same objective standard: whether the judge's impartiality could reasonably be questioned. The majority's position is particularly tenuous in this case: it is hard to argue convincingly that Judge Hilliard was objectively unreasonable in deciding Hurles's recusal motion, given that another Arizona Superior Court Judge, Judge Ballinger, independently

reached the same conclusion as Judge Hilliard.[16] And as this discussion has made plain, the majority's repeated suggestion that Judge Hilliard behaved "improperly" in submitting a brief in the special action proceeding (and that the Arizona Court of Appeals so held) is baseless.

Second, the majority argues that the state court's fact-finding process was flawed because the court declined to hold an evidentiary hearing on Hurles's appearance-of-bias claim. Maj. op. at 9059-62. This contention also fails; obviously, an error in a fact-finding process is irrelevant if there are no material facts in dispute. In the cases cited by the majority, we have made clear that an evidentiary hearing is necessary only when a dispute relates to a material fact that must be resolved in order to fully adjudicate the habeas petitioner's claims. *See, e.g.*, *Perez v. Rosario*, 459 F.3d 943, 950-51 (9th Cir. 2006) ("Where there is no likelihood that an evidentiary hearing would have affected the determination of the state court, its failure to hold one does not make such determination unreasonable."); *see also Taylor v. Maddox*, 366 F.3d 992, 1000-01 (9th Cir. 2004). As already noted, however, there was no such dispute here: Hurles's claim that Judge Hilliard appeared biased was based on the undisputed fact that a brief was submitted in her name in the special action proceeding.

---

[16]Presumably because Judge Ballinger's independent determination that Judge Hilliard could decide Hurles's recusal motion completely undermines the majority's claim that Judge Hilliard was objectively unreasonable in doing so, the majority tries to avoid considering the import of Judge Ballinger's decision. Maj. op. at 9065 n.6 ("Judge Ballinger's decision is not the decision we are reviewing."). This is an error: in adjudicating a habeas petitioner's claim, a federal court should consider "the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). Moreover, Hurles's recusal motion presented the same arguments and bias allegations as his second petition for post-conviction relief and even incorporated those arguments by reference; accordingly, Judge Ballinger's decision was on all fours with Judge Hilliard's subsequent resolution of those same arguments.

Although Hurles belatedly (in his reply brief in the second state post-conviction proceeding) stated that he "anticipate[d] the need for factual development" in order "to explore the nature of the contacts" between the Attorney General's office and the court, he did not indicate what facts could have been developed that would have supported his due process claim, or why the nature of the contacts made a difference to his claim that Judge Hilliard appeared biased based on her participation in the special action proceeding.[17] And because his claim focuses on apparent, rather than actual, bias, the only salient facts are those already in the record: the fact of Judge Hilliard's participation in the special action and her brief's statements in that proceeding.

Because there is no basis to conclude that the state court's decision was based on an unreasonable determination of the facts in light of the evidence, § 2254(d)(2), the majority is not relieved of AEDPA deference under that prong of the statute. In holding otherwise, the majority's decision invites future habeas petitioners to raise the baseless argument that a state court's legal rulings are actually unreasonable factual determinations. Such an approach is directly contrary to Congress's command in § 2254(d) and blurs a critical line that extends far beyond our habeas jurisprudence.

IV

The Supreme Court has harshly criticized our non-compliance with AEDPA deference, not only this Term,[18] but in many past years as well.[19] Here the majority once again dis-

---

[17]If anything, the nature of those contacts would be relevant only to a claim of actual bias, which Hurles disclaimed in his state-court papers. *See supra* note 15.

[18]*See, e.g.*, *Cullen*, 131 S. Ct. 1388; *Felkner v. Jackson*, 131 S. Ct. 1305 (2011) (per curiam); *Swarthout v. Cooke*, 131 S. Ct. 859 (2011) (per curiam); *Harrington v. Richter*, 131 S. Ct. 770; *Premo v. Moore*, 131 S. Ct. 733 (2011).

[19]*See, e.g.*, *Schriro v. Smith*, 546 U.S. 6, 8 (2005) (per curiam) ("[T]he Court of Appeals exceeded its limited authority on habeas review . . . .");

regards the AEDPA rules that limit a federal habeas court's "role and authority," *Rice v. Collins*, 546 U.S. 333, 335 (2006), by claiming it is relieved of AEDPA deference due to the state court's "unreasonable determination of the facts," § 2254(d)(2). But here the state court's ruling was a legal one. There are no disputed material facts, and the only question is whether applying the Supreme Court's objective rules to the undisputed facts reveals a due process violation. Under § 2254(d)(1), the state court's determination that there was no such violation is not contrary to any Supreme Court precedent. Because the majority's decision invalidates a lawfully imposed capital sentence, further frays the (increasingly threadbare) fabric of our AEDPA and due process jurisprudence, and lays the groundwork for future, even more frivolous habeas challenges to trial judges' impartiality, I must dissent.

---

*Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam) ("[The Ninth Circuit's] conclusion failed to give appropriate deference to the state court's decision."); *Yarborough v. Gentry*, 540 U.S. 1, 11 (2003) (per curiam) (same); *Woodford v. Visciotti*, 537 U.S. 19, 20 (2002) (per curiam) (reversing Ninth Circuit's grant of habeas relief because it "exceed[ed] the limits imposed on federal habeas review by 28 U.S.C. § 2254(d)"); *Early v. Packer*, 537 U.S. 3, 10 (2002) (per curiam) (admonishing the Ninth Circuit for "repeatedly and erroneously substitut[ing]" the phrase " *'failed to apply'* clearly established Supreme Court law" for "the more demanding requirement of § 2254(d)(1): that the decision be *'contrary to'* clearly established Supreme Court law" (emphases added)).